GILDEA, Chief Justice.
Appellant Nigeria Lee Harvey appeals his convictions for first-degree murder and attempted first-degree murder. Harvey argues that the district court admitted evidence in violation of the Fourth Amendment to the United States Constitution, Minn. Stat. § 626A.42 (2018), and Minn. R. Evid. 702. Harvey also argues that the district court erred when it overruled his Batson[1] challenge. Finally, he raises claims of ineffective assistance of counsel and prosecutorial misconduct in his pro se supplemental brief. We conclude that the admission of the challenged evidence did not violate the Fourth Amendment or the substantive requirements of Minn. Stat. § 626A.42, and to the extent that it violated Minn. R. Evid. 702, the error was harmless. We also conclude that the district court did not clearly err when it determined that Harvey failed to make a prima facie showing of discrimination under step *797 one of the Batson inquiry. Finally, we conclude that the issues raised in Harvey's pro se supplemental brief are without merit. Accordingly, we affirm.
FACTS
Harvey was convicted of the premeditated first-degree murder of Omarr Johnson and the attempted premeditated first-degree murder of Harvey's drug supplier, A.A. The crimes occurred just after midnight on July 27, 2015, when Johnson and A.A. were shot in Minneapolis at the intersection of 34th Avenue North and Morgan Avenue North. A ShotSpotter[2] device detected eleven gunshots between 12:06:52 a.m. and 12:07:34 a.m. on July 27.[3] A.A. survived a gunshot wound to the head and drove himself to the hospital, but Johnson died at the scene from multiple gunshot wounds. At the hospital, A.A. told the police that Harvey had shot him and Johnson.
As part of their investigation, police sought records for Harvey's cell phone, including cell-site location information (CSLI). The police wanted Harvey's cell phone records because A.A. told police that "Najee"[4] and Johnson had been in contact via cell phone shortly before the shootings. Johnson's cell phone, which police recovered at the scene, contained a record of two calls, just before the shootings, with a contact named "Nige." Police sought records for the phone number associated with Nige and obtained a court order authorizing the disclosure of the CSLI for that number. The records confirmed that the number associated with Nige was the number for Harvey's cell phone.
After police obtained Harvey's cell phone records, FBI Agent James Berni analyzed the CSLI to form an opinion regarding Harvey's whereabouts before, during, and after the shootings. In August 2016, before Harvey's trial, Agent Berni also conducted a drive test using a device called a Gladiator Autonomous Receiver (GAR) to determine the outer limits of the cell tower and sector that the cell phone records showed Harvey's phone accessed at the time of the shootings.[5]
Following the police investigation, the State charged Harvey. A Hennepin County grand jury subsequently indicted Harvey for first-degree premeditated murder and attempted premeditated first-degree murder. The grand jury also indicted Harvey for first-degree murder while attempting *798 to commit aggravated robbery and attempted first-degree murder while attempting to commit aggravated robbery. Harvey pleaded not guilty to these charges.
Before trial, Harvey moved to suppress the CSLI evidence, arguing that it was collected in violation of the Fourth Amendment and Minnesota Statutes. The district court denied Harvey's motion. The court also held a Frye - Mack hearing to determine whether the CSLI and GAR drive-test evidence involved novel scientific theories and, if so, to provide the State an opportunity to demonstrate that the theory was generally accepted in the relevant scientific community and that the particular scientific evidence had foundational reliability.[6] The district court concluded that the evidence was admissible under Minn. R. Evid. 702, and the case proceeded to trial.
During jury selection, the State used a peremptory challenge to remove an African-American venire member, prospective Juror 18. Harvey objected to the peremptory challenge, arguing that it violated Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). After determining that Harvey failed to make a prima facie showing of discrimination under step one of a Batson inquiry, the district court overruled the objection.
At trial, A.A. testified to the following facts. He and Johnson had known each other since they were 14 years old and were very close friends, like "brothers." In the summer of 2015, A.A. was "selling drugs" and "dealing with the ladies." He had a couple of guys "copping from [him,]" which means they were buying drugs from him, and they, in turn, sold to others. Johnson was "copping" from A.A., and although Johnson was new to drug dealing, he was "like [A.A.'s] right-hand man." At some point, Johnson introduced Harvey to A.A., and Harvey started "copping" from A.A. as well. A.A. "fronted" drugs to Harvey, meaning that A.A. would give Harvey the drugs up front with the expectation that A.A. would be paid back, because Harvey was close to Johnson.
A.A. testified that he had seen Harvey driving a 2003 silver, four-door Chevy Malibu with "Car Hop" plates.[7] And A.A. explained that in the past, he and Harvey had been together in the Chevy Malibu with the same Car Hop plates.
At some point, A.A. learned that Harvey was upset with Johnson because Johnson had taken up with Harvey's girlfriend, Jas (Jazzy). Jas would sometimes sell drugs for Harvey. Some weeks before the shootings, Harvey told A.A. that Johnson "knows better 'cause [Harvey is] good with the hands [meaning his fists] and good with the pistol." A.A. explained that Jazzy being with Johnson "kind of messed [Harvey's] money up" and was hurting him financially because Jazzy started selling drugs for Johnson instead of Harvey.
*799 Harvey owed A.A. $175 for an "eightball of hard," which is crack cocaine. On the night of July 26, A.A. wanted to talk to Harvey about the money he owed him, but Harvey was dodging his calls and said his phone was broken, so A.A. had Johnson call Harvey. A.A. told Johnson that if Harvey did not pay, Johnson would have to pay "because [A.A.] only gave [the crack cocaine] to [Harvey] because of [Johnson]."
When Johnson called Harvey, using a speakerphone, Harvey answered, saying he was at 32nd and Clinton, at the home of the mother of his child. A.A. and Johnson went to that home and then called Harvey back, saying, "you ain't over there," and Harvey responded, "I'm over north now, I'm on 34th and Morgan." They told Harvey, "We'll be over there in 15 minutes." A.A. and Johnson drove to 34th and Morgan in a white Buick Lucerne. When they arrived, A.A. and Johnson sat in the car smoking marijuana, drinking lean (a mix of promethazine and codeine), and talking. They were there about 15 minutes and had decided to leave when they finished smoking. Soon after, Harvey pulled up behind them. A.A. saw the headlights of Harvey's Malibu about eight feet behind them through his side mirror. He was sure it was a Malibu. A.A. saw Harvey-or Najee, as A.A. knew him-get out of the driver's side of the Malibu. Harvey jumped in the backseat of the Buick, with A.A. and Johnson sitting in the front.
At first, the three men talked and laughed. Harvey was shuffling money in the backseat and said he was getting the money together. When A.A turned around after Johnson said something funny, Harvey shot him in the head, at his ear. Neither A.A. nor Johnson were armed, and A.A. explained that, after being shot, he just laid there, bleeding. He slumped down and "[e]verything went white." A.A. next remembered feeling someone go into his pocket and take some money. He said that on that night, he was carrying $2,770 in drug money. He then heard somebody say, "where'd he go." After that, A.A. heard "like five more shots[,]" which "startled [him] to the point [that he] sat up and threw it in drive and ... sped north of Morgan" to the hospital.
Sergeant Charles Green of the Minneapolis Police Department came to the hospital to question A.A. Concerned about his own and his family's safety, A.A. told the police what happened because he felt he "ha[d] to do the right thing. My brother was killed." At trial, A.A. described his conversation with Sergeant Green, including identifying Najee as the shooter, relating the events leading up to the shootings, and Sergeant Green telling him that Johnson had died. As part of his testimony, A.A. identified Harvey in court as the person who shot him and Johnson.
In addition to A.A.'s testimony, the State offered testimony from law enforcement. Forensic scientist Tracy MacDougall of the Minneapolis crime lab unit testified that she processed the Buick Lucerne that A.A. drove to the hospital. She testified that she found bullet fragments and conducted a DNA swab of the vehicle's interior. MacDougall also testified about processing a 2003 Chevy Malibu on August 4, 2015. Police saw Harvey in this vehicle approximately four days before the shootings. MacDougall testified that there were two license plate placards for Car Hop located on the rear passenger floor. MacDougall also testified that she found a T-Mobile bill, addressed to Harvey, inside the Malibu.
Sergeant Green testified regarding the timing and location of the gunshots, as provided by the ShotSpotter. The jury heard recordings of the gunshots. Sergeant Green also confirmed that A.A. identified *800 Harvey as the shooter when Green spoke to A.A. at the hospital.
Sergeant Green further testified that there were surveillance video cameras on Lowry Avenue North, just south of the scene of the shootings, and that he obtained footage from July 26, 2015 at 11:50 p.m. through July 27 at 12:20 a.m., from just before and after the shootings. Sergeant Green showed the jury still shots from the video footage of a vehicle that the State contended was the Chevy Malibu that A.A. said Harvey was driving. Green's presentation showed the "target vehicle" at various locations along Lowry Avenue North. The still shots showed the vehicle two blocks south of the scene of the shootings traveling towards the scene of the shootings just before the first shots were heard. And the still shots showed the vehicle driving away from the scene just after the last shot was fired. Sergeant Green testified that the vehicle in the video footage appeared to be the same make and model of the vehicle-Chevy Malibu-that he was searching for in connection with the shootings.
Sergeant Green also testified that a forensic examination of Johnson's phone recovered at the scene showed that "Johnson communicated with a phone number [ (XXX)-XXX-2786] two times before he was killed, and in his contacts that number is for a Najee, N-A-G-E." The forensic examination showed that Johnson's phone had a call with that phone number at 11:17:54 p.m. and that the last time the phone communicated with that number was a call at 12:00:12 a.m. He further testified that he learned that Harvey was the Sprint subscriber registered to the phone number in question.
A forensic scientist who performs DNA analysis for the Minnesota Bureau of Criminal Apprehension also testified for the State. She tested various swabs of what was apparently blood from the street where the shootings occurred and determined that each swab matched Johnson, but not A.A. or Harvey.
Finally, FBI Agent James Berni testified for the State. Through Agent Berni, the State sought to establish that Harvey's cell phone was in the area of the shootings at the time the shots were fired. Agent Berni's testimony relied on both CSLI and GAR drive-test evidence. The State also sought to disprove Harvey's contention that, at the time of the shootings, he was at the home of a friend's mother on the 2700 block of Girard Avenue North.
In defense, Harvey chose to testify. He testified that he had known Johnson since 2013 or 2014 and that they "were extremely close." Harvey said that Johnson introduced him to A.A. in late May of 2015. His relationship with A.A. was mostly about "business," meaning selling drugs.
Harvey testified that he had two cell phones and that one phone was for drugs, and one phone was for friends and family. He acknowledged that (XXX)-XXX-2786 was his phone number for drugs. Harvey denied shooting either Johnson or A.A., and he explained that he was at the house of his friend's mother around the time of the shootings.
The jury found Harvey guilty of the first-degree premeditated murder of Johnson (Count I) and first-degree premeditated attempted murder of A.A. (Count III).[8] The district court convicted and sentenced Harvey to life without the possibility of release for Count I and 210 months for *801 Count III, to be served concurrently. This direct appeal follows.
ANALYSIS
On appeal, Harvey argues that he is entitled to a new trial and reversal of his convictions. First, he argues that the police obtained the CSLI in violation of the Fourth Amendment and Minn. Stat. § 626A.42, and therefore the district court erred in admitting this evidence. Second, he argues that the CSLI and GAR evidence was inadmissible under Minn. R. Evid. 702. Third, he argues that the district court committed reversible error when the court overruled his Batson challenge to the State's peremptory challenge to Juror 18. Fourth, he raises claims of ineffective assistance of counsel and prosecutorial misconduct in his pro se supplemental brief. We address each issue in turn.
I.
We turn first to the question of whether, as Harvey argues, the police obtained the CSLI evidence in violation of Minn. Stat. § 626A.42 or the Fourth Amendment to the United States Constitution. We consider the statutory question first. See State v. Bourke , 718 N.W.2d 922, 926 (Minn. 2006) ("Our general practice is to avoid a constitutional ruling if there is another basis on which a case can be decided.") (citation omitted) (internal quotation marks omitted).
A.
Harvey argues that the State obtained the CLSI evidence in violation of Minn. Stat. § 626A.42. In essence, the State argues that it complied with the substantive requirements of section 626A.42 when it obtained the CLSI under a different statute, Minn. Stat. § 626A.28 (2018).[9] The parties' arguments require us to examine both section 626A.28 and section 626A.42.
Under Minn. Stat. § 626A.28, subd. 2,
[a] governmental entity may require a provider of remote computing service to disclose the contents of electronic communication ... (1) without required notice to the subscriber or customer, if the governmental entity obtains a warrant; or (2) with prior notice if the governmental entity: ... obtains a court order for such disclosure under subdivision 4.
Under Minn. Stat. § 626A.28, subd. 4, "[a] court order for disclosure under subdivision 2 ... must issue only if the governmental entity shows that there is reason to believe the contents of a wire or electronic communication, or the records or other information sought, are relevant to a legitimate law enforcement inquiry."
Although Minn. Stat. § 626A.28 applies to some types of cellular data, Minn. Stat. § 626A.42, governs how governmental entities may obtain "location information." The term "location information" is defined by the statute as "information concerning the *802 location of an electronic device that, in whole or in part, is generated or derived from or obtained by the operation of an electronic device." Minn. Stat. § 626A.42, subd. 1(e). Section 626A.42, subdivision 2, provides that, except under circumstances inapplicable to this case, "a government entity may not obtain the location information of an electronic device without a tracking warrant."
Under subdivision 2, "a warrant granting access to location information must be issued only if the government entity shows that there is probable cause the person who possesses an electronic device is committing, has committed, or is about to commit a crime. " Id. (emphasis added). Warrant applications must include:
a full and complete statement of the facts and circumstances relied on by the applicant to justify the applicant's belief that a warrant should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, and (ii) the identity of the person, if known, committing the offense whose location information is to be obtained.
Minn. Stat. § 626A.42, subd. 2(a)(2). Subdivision 6 prohibits the use, in any criminal proceeding, of evidence obtained in violation of Minn. Stat. § 626A.42.
With these statutes in mind, we turn to Harvey's argument. Harvey argues that the State violated section 626A.42 because the State collected Harvey's CSLI without a warrant. Because the CSLI evidence was collected in violation of section 626A.42, Harvey argues, it is inadmissible under the plain language of subdivision 6. We agree with Harvey that the State did not follow the procedures set forth in Minn. Stat. § 626A.42 for obtaining "location information." Indeed, the State applied for the release of "location information" under section 626A.28, rather than section 626A.42.
But, notwithstanding the State's failure to cite the correct provision in its application, the State complied with the substantive requirements of section 626A.42, subdivision 2(a)(2). The application contained: (1) "a full and complete statement of the facts and circumstances relied on by the applicant," including details of the offense committed and the identity of the person believed to have committed the offense whose location information would be obtained as a result of the court order, and (2) a showing that there was probable cause "the person who possesses an electronic device is committing, has committed, or is about to commit a crime." See Minn. Stat. § 626A.42, subd. 2(a)(2). And the district court's order concluded that there was probable cause.
Harvey argues that the probable-cause determination should be set aside as nothing more than "boilerplate." We disagree.
When reviewed under the appropriate standard, the supporting affidavit and the district court's order reflect a valid finding of probable cause. In reviewing whether a warrant is supported by probable cause, we "do not review the lower court's decision de novo." State v. Harris , 589 N.W.2d 782, 787 (Minn. 1999). Instead, we "afford[ ] 'great deference' to the issuing judge's finding of probable cause." Id. (quoting State v. Souto , 578 N.W.2d 744, 747 (Minn. 1998) ); see also, e.g. , Massachusetts v. Upton , 466 U.S. 727, 732-33, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). Our review is confined "to ensuring that 'the issuing judge had a "substantial basis" for concluding that probable cause existed.' " Harris , 589 N.W.2d at 788 (quoting State v. Zanter , 535 N.W.2d 624, 633 (Minn. 1995) ); see also *803 Illinois v. Gates , 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). That standard is met here.
The affidavit submitted with the application, from Sergeant Villella, contained numerous details supporting the probable-cause determination. It set forth the circumstances of the shooting of A.A. and the homicide of Johnson. The affidavit stated that the investigating officers "recovered a black LG cellular phone that was on the street near the area where [Johnson] was found on the sidewalk." It stated that A.A. "told investigators that the last person [Johnson] talked to on his cell phone, just prior to the shootings, was a male known to [A.A.] as 'Najee', and that 'Najee' is the person [Johnson] agreed to meet at 34th Avenue North/Morgan Avenue North, Minneapolis." Further, Villella's affidavit stated that A.A. had identified Najee as the person who shot him and that A.A. positively identified Harvey as Najee.
Villella also averred that she had reviewed the call history of Johnson's LG phone recovered at the scene and "learned of multiple cell phone communications with [XXX-XXX-2786] (Contact name 'Nige')" just before the approximate time the gunshots were detected by ShotSpotter equipment on July 27 at 12:07 a.m. The affidavit alleged that Johnson's phone showed an outgoing call to XXX-XXX-2786 at 11:58:16 p.m. on July 26 that lasted 37 seconds and an "unknown" call to the same phone number at 11:59:04 p.m. that lasted for 1 minute and 6 seconds.
On the basis of these facts, the district court issued an order authorizing the release of CSLI records for the phone with the number XXX-XXX-2786, Harvey's phone. The district court found that there was reason to believe that the information sought was relevant to an ongoing homicide investigation. See also Minn. Stat. § 626A.28. But the order also contained a probable-cause determination. The order stated:
The Court further finds there is probable cause to believe that a crime has been committed and that a particular person has committed a crime and that the disclosure of records concerning electronic communication will result in the discovery of evidence which tends to show a crime has been committed or tends to show that a particular person has committed a crime.
And, despite Harvey's assertion to the contrary, the affidavit provided a sufficient nexus to Harvey's CSLI. We have said that, in determining whether there is probable cause to search, the issuing judge's "task ... 'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " Harris , 589 N.W.2d at 788 (quoting Gates , 462 U.S. at 238, 103 S.Ct. 2317 ). Numerous allegations in Villella's affidavit and reasonable inferences to be drawn from those allegations sufficiently link Harvey to the shooting of A.A. and the murder of Johnson.
Harvey is correct that A.A. did not identify the telephone number as belonging to Harvey and that Sprint did not tell the police that the phone number belonged to Harvey. But the conclusion that the phone number belonged to Harvey is apparent in the facts set out in the affidavit. Specifically, the affidavit alleged that A.A. positively identified "Nigeria Lee Harvey" as Najee, the person who shot him. The affidavit also contained A.A.'s alleged statement that Johnson and Najee communicated via cell phone just before the shootings, and it provided corroborating evidence from Johnson's cell phone. That phone, recovered from the scene of the murder, showed *804 two calls with Nige just prior to the murder. Given the similarity of Najee and Nige and the similarity of these names to Harvey's first name, Nigeria, it was reasonable to infer that Harvey was, in fact, the shooter. And given A.A.'s alleged statement that Najee spoke to Johnson before the shootings and the corroborating information obtained from Johnson's cell phone, it was reasonable to infer that the cell phone number belonged to Harvey.
At bottom, the district court made a practical, common-sense determination that there was a fair probability that evidence of a crime would be found in the cell phone records. See Harris , 589 N.W.2d at 788. Sergeant Villella's affidavit provided the district court with a substantial basis for determining that probable cause existed. See id. ; Gates , 462 U.S. at 238, 103 S.Ct. 2317. Accordingly, we conclude that the district court did not err in determining that there was probable cause sufficient to authorize the police to secure the cell phone location records. Because the order is supported by probable cause, we hold that the State complied with the substantive requirements of Minn. Stat. § 626A.42.[10]
B.
Separate from his statutory argument, Harvey argues that the CSLI evidence was collected in violation of the Fourth Amendment to the United States Constitution. Harvey relies on Carpenter v. United States , --- U.S. ----, 138 S. Ct. 2206, 201 L.Ed.2d 507 (2018).
In Carpenter , a suspect apprehended for a series of robberies identified a number of accomplices who had also taken part in the crimes. Id. at ----, 138 S. Ct. at 2212. The suspect provided the FBI with the accomplices' phone numbers, and Carpenter's number was among them. Id. With this information, prosecutors applied for court orders to obtain Carpenter's cell phone records under the Stored Communications Act, 18 U.S.C. § 2703(d). Carpenter , --- at ----, 138 S. Ct. at 2212. Under the Stored Communications Act, the government can "compel the disclosure of certain telecommunications records when it 'offers specific and articulable facts showing that there are reasonable grounds to believe' that the records sought 'are relevant and material to an ongoing criminal investigation.' " Id. at ----, 138 S. Ct. at 2212 (quoting 18 U.S.C. § 2703(d) ). Federal magistrate judges issued two such orders, and "[a]ltogether the Government obtained 12,898 location points cataloging Carpenter's movements." Id.
Carpenter was charged with robbery and firearm-related crimes and, before trial, he moved to suppress the CSLI evidence, arguing that the Government violated the Fourth Amendment by obtaining his records without a warrant supported by probable cause. Id. The district court denied Carpenter's motion to suppress the CSLI evidence, and Carpenter was convicted. Id.
*805 On appeal, the Court of Appeals for the Sixth Circuit "held that Carpenter lacked a reasonable expectation of privacy in the location information collected by the FBI because he had shared that information with his wireless carriers," and he did so voluntarily. Id. at ----, 138 S. Ct. at 2213. Accordingly, the Sixth Circuit held that the Fourth Amendment does not protect the cellular carriers' records. Id.
The Supreme Court disagreed and held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI," and "[t]he location information obtained from Carpenter's wireless carriers was the product of a search." Id. at ----, 138 S. Ct. at 2217. Having concluded that the government's acquisition of Carpenter's records was a search, the Court held "that the Government must generally obtain a warrant supported by probable cause before acquiring such records." Id. at ----, 138 S. Ct. at 2221. The Court noted that the showing required by 18 U.S.C. § 2703(d) "falls well short of the probable cause required for a warrant." Carpenter , --- U.S. ----, 138 S. Ct. at 2221. Accordingly, it held that an order issued under 2703(d) of the Stored Communications Act is inadequate for Fourth Amendment purposes. Carpenter , --- U.S. ----, 138 S. Ct. at 2221. Rather, "[b]efore compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one-get a warrant." Id.
Harvey's case bears many similarities to Carpenter . As in Carpenter , the State obtained the CSLI evidence, data which is subject to the Fourth Amendment's warrant requirement. See Carpenter , --- U.S. ----, 138 S. Ct. at 2221. The State obtained Harvey's CSLI, citing Minn. Stat. § 626A.28, and that section's requirements for the issuance of an order are nearly identical to those of section 2703(d) of the Stored Communications Act. Compare Minn. Stat. § 626A.28, subd. 4, with 18 U.S.C. § 2703(d). In essence, both require a showing of reasonable relevance to an ongoing investigation. See 18 U.S.C. § 2703(d) ; Minn. Stat. § 626A.28, subd. 4. And in both cases, mere compliance with the statutory requirement falls short of the probable-cause requirement under the Fourth Amendment. See 18 U.S.C. § 2703(d) ; Minn. Stat. § 626A.28, subd. 4 ; Carpenter , --- U.S. ----, 138 S. Ct. at 2221.
Notwithstanding the many factual similarities with Carpenter , Harvey's case is distinguishable on one dispositive fact. Unlike the order in Carpenter , the order that the district court issued here, although citing Minn. Stat. § 626A.28, nevertheless contained a probable-cause determination. Because the search was authorized by the district court and supported by probable cause, as Carpenter requires, we hold that the police did not violate the Fourth Amendment when they acquired the CSLI evidence.
II.
We turn next to Harvey's argument that the CSLI and GAR drive-test evidence should have not been admitted because the State failed to prove (1) that the technology used or the test performed had been generally accepted in the relevant scientific community, or (2) that the particular scientific evidence has foundational reliability. The State, for its part, argues that the district court neither erred nor abused its discretion.
Minnesota Rule of Evidence 702, provides that:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to *806 determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community.
(Emphasis added.) The language italicized above was added in 2006 and effectively incorporated the Frye - Mack standard into Rule 702.[11] Doe v. Archdiocese of St. Paul , 817 N.W.2d 150, 165-68 (Minn. 2012).
Under Rule 702, a court must first determine whether the proffered evidence is novel. If the evidence is not novel, the court need not consider whether it has been generally accepted by the scientific community before moving on to the question of whether the evidence has foundational reliability. State v. Roman Nose , 649 N.W.2d 815, 819 (Minn. 2002) (explaining that "[w]hen the scientific technique that produces the scientific evidence is no longer novel or emerging, then the pretrial hearing should focus on the second prong of the Frye - Mack standard"-foundational reliability). As long as the district court considers the relevant factors, it does not matter whether a district court calls its analysis a " Frye - Mack " analysis or a " Rule 702" analysis. Doe , 817 N.W.2d at 168.
We review de novo a district court's determination that novel scientific evidence is generally accepted in the relevant scientific community. Goeb v. Tharaldson , 615 N.W.2d 800, 815 (Minn. 2000) (explaining that whether a particular principle or technique is generally accepted in the relevant scientific field is a question of law that we review de novo). By contrast, we review a district court's determination that the particular scientific evidence has foundational reliability for abuse of discretion. Id. (explaining that a district court's foundational reliability determinations are reviewed under an abuse of discretion standard). Keeping these legal principles in mind, we separately consider the district court's admission of the CSLI and GAR drive-test evidence.
A.
The State introduced the CSLI evidence through Agent Berni.[12] The district court concluded that "[t]he evidence proffered by the State regarding data, information, and results derived from Sprint's historical [call detail records] and [per call measurement data] records for [Harvey's] cell phone number ... regarding the general location of [his] cell phone during times relevant to the underlying crime is admissible pursuant to Minn. R. Evid. 702." As part of its analysis, the district court concluded that CSLI evidence did not involve a novel scientific theory because location and tracking evidence "based on defendants' cell phones pinging off cell towers has routinely been admitted in Minnesota courts for at least a decade." In the alternative, the district court determined that the underlying scientific theory was generally *807 accepted in the relevant scientific community. Moving to the next step in the required analysis, the district court determined that the particular scientific evidence had foundational reliability.
We first consider whether the district court erred when it concluded that the CSLI evidence did not involve a novel scientific theory. As the district court correctly recognized, if the proffered evidence is not novel, the court does not need to assess its general acceptance. See Roman Nose , 649 N.W.2d at 819 (considering only the second prong after determining that the scientific technique was no longer novel); see also Minn. R. Evid. 702 ("[I]f the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted."); Doe , 817 N.W.2d at 164-65 (stating that "[i]t is only when the proponent offers 'novel' 'scientific' evidence that the" general acceptance standard applies); Commonwealth v. Dengler , 586 Pa. 54, 890 A.2d 372, 382 (2005) ("This Court has made it clear that Frye is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science.").
Our cases have not always provided clear guidance regarding how courts should determine whether a scientific technique is novel. At times, we have discussed the threshold requirement-whether a technique is novel-at the same time we discussed whether a technique is generally accepted. See Roman Nose , 649 N.W.2d at 821 (stating that "we have not decided general acceptance for Minnesota courts" when discussing the state's argument that the scientific technique at issue was not novel). This imprecise language should not be read to mean that appellate review of a scientific technique is a prerequisite to determining that a scientific technique is not novel.[13]
It is true that, once we have analyzed a novel scientific technique under Rule 702 and determined that such evidence is admissible, the technique is no longer novel. But it does not follow that scientific evidence is novel simply because Minnesota appellate courts have not yet analyzed a particular form of scientific evidence under the requirements of Rule 702. A scientific technique may exist for decades without being addressed by a Minnesota appellate court. In other words, whether or not a scientific technique is novel is not determined merely by reference to what Minnesota appellate courts have addressed in the past. Rather, whether a scientific technique is novel is determined by reference to whether the technique is "new." Webster's Third New International Dictionary 1546 (1961) (defining "novel" as "new"). For example, in State v. Hodgson , we rejected the defendant's *808 argument that bite-mark analysis evidence was not widely accepted in the relevant scientific community and was therefore inadmissible. 512 N.W.2d 95, 98 (Minn. 1994). We rejected the inadmissibility argument, noting that bite-mark analysis by a dentist who specialized in teeth marking "is not a novel or emerging type of scientific evidence." Id. We reach the same conclusion here.
Agent Berni testified that he had been using this technology as long ago as 2003 when he was tracking "high value targets" in Iraq. And he explained that the FBI has used it in thousands of investigations and its agents have testified based on the technology in more than 1,000 trials. In addition, CSLI evidence has been admitted in Minnesota courts for more than 10 years. See, e.g. , State v. Mosley , 853 N.W.2d 789, 795 (Minn. 2014) (discussing CSLI evidence but not examining whether it was admissible); Francis v. State , 781 N.W.2d 892, 895 (Minn. 2010) (same); State v. Tran , 712 N.W.2d 540, 543 (Minn. 2006) (same). Such long-standing use confirms the district court's conclusion that the CSLI is not novel.
Harvey makes essentially no argument regarding the novelty of CSLI; he focuses instead on whether the State proved general acceptance.[14] But the threshold requirement is novelty. Minn. R. Evid. 702. Here, as in Hodgson , we are satisfied that analysis of CSLI data is not a novel or emerging form of scientific evidence. We therefore hold that the district court did not err in concluding that it was not required to consider whether the underlying scientific theory has been generally accepted in the relevant scientific community.
We next consider whether the district court abused its discretion when it determined that Agent Berni's opinion based on the CSLI had foundational reliability. The district court "abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." Riley v. State , 792 N.W.2d 831, 833 (Minn. 2011). No abuse of discretion occurred here.
At the Frye - Mack hearing, Agent Berni testified that Sprint's records, including CSLI, are reliable. He explained that cell companies use call detail records and per call measurement data to evaluate their network coverage. Agent Berni testified that cell phone service providers have a vested interest in maintaining accurate records so that they can accurately bill customers for roaming services and that accurate billing requires an accurate record of what towers and sectors are accessed by cellular customers. Agent Berni also testified that the records are both reliable and accurate because under law, cell phone service providers are required to provide a tower and sector for any 911 call placed within their network. The district court considered this testimony in its analysis of whether the Sprint records and Agent Berni's opinion based on those records had foundational reliability. Our review of the record confirms that the district court's foundational-reliability determination was not against logic and the facts in the record. Consequently, we hold that the district court did not abuse its discretion when it determined that Agent *809 Berni's opinion had foundational reliability.
B.
Having concluded that the CSLI evidence was properly admitted, we now consider whether the district court committed reversible error when it admitted the expert testimony regarding GAR drive-test evidence. Like the CSLI evidence, the drive-test evidence was offered to prove the location of Harvey's cell phone at the time of the shootings. Harvey challenges the district court's admission of the GAR drive-test evidence, arguing that the State did not prove that it was generally accepted in the relevant scientific community.
The district court relied on a federal district court's unpublished decision: United States v. Frazier , No. 2:15-CR-044-GMN-GWF, 2016 WL 4994956 (D. Nev. Sept. 16, 2016). In Frazier , the court said, " 'drive test' cell phone tracking methodology is generally accepted by recognized authorities in the field." Id. at *2. Relying on Frazier , the district court concluded that the GAR drive-testing technology was generally accepted in the law enforcement and telephone industry communities.
We need not decide whether drive-test evidence is novel or generally accepted in the relevant scientific community because, even if it is novel but not generally accepted, the admission of the GAR drive-test evidence was harmless under the circumstances of this case.[15]
Harvey bears the burden of proving both that the district court erred and that the error was prejudicial. State v. Loebach , 310 N.W.2d 58, 64 (Minn. 1981) ("A defendant claiming error in the trial court's reception of evidence has the burden of showing both the error and the prejudice resulting from the error.").
*810 When "there is no reasonable possibility that it 'substantially influence[d] the jury's decision,' " the error is harmless. State v. Taylor , 869 N.W.2d 1, 14 (Minn. 2015) (quoting State v. DeShay , 669 N.W.2d 878, 888 (Minn. 2003) ).
The error here, if any, is harmless because there is no reasonable possibility that the jury's decision was substantially influenced by Agent Berni's testimony derived from drive testing with the GAR. The vast majority of the slides presented during Agent Berni's testimony contained information derived only from CSLI evidence from Sprint's call detail records and per call measurement data for the phone (XXX)-XXX-2786. Agent Berni's testimony regarding these slides placed Harvey's cell phone within the area covered by the tower and sector that Sprint's records show the cell phone accessed at the time of the shootings. The location of the shootings-34th and Morgan-is squarely within that area.[16]
Agent Berni's testimony derived from the GAR drive-testing technology consisted of only one slide, and what it added to his testimony regarding the Sprint records was not significant. It, too, placed Harvey's cell phone within the area covered by the tower and sector that Sprint's records show that the cell phone accessed at the time of the shootings. Agent Berni's testimony derived from the GAR drive-testing technology layered in additional, granular detail regarding the outer limits of the tower and sector's dominant and nondominant zones. But the outer limits of this particular tower and sector's coverage were not important because the location of the shootings was squarely within the sector's coverage area, not on the outermost edges. Moreover, Harvey's alibi and testimony placed Harvey in another sector entirely, and not in the sector that Sprint records show the phone accessed when the shootings occurred.
Combined with other admissible evidence, Agent Berni's testimony based on the CSLI evidence-not the GAR-derived drive-test data-as well as other evidence overwhelmingly established Harvey's presence in the vicinity of the shootings at the time of the shootings. Because Agent Berni's testimony based on the GAR drive-test was largely cumulative-and what was not cumulative was of limited relevance-there is no reasonable possibility that it substantially affected the jury's decision, and therefore its admission was harmless.
III.
We turn next to the Batson issue. Harvey argues that the district court erred when the court overruled his Batson objection to the State's peremptory challenge to Juror 18. In Batson v. Kentucky , the United States Supreme Court held that the exclusion of prospective jurors through peremptory challenges is subject to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ; see also State v. Pendleton , 725 N.W.2d 717, 723 (Minn. 2007). A peremptory challenge, if used against a *811 prospective juror because of the juror's race, "denies equal protection both to the prospective juror, because it denies her the right to participate in jury service, and to the defendant, because it violates his right to be tried by a jury made up of members selected by nondiscriminatory criteria." Pendleton , 725 N.W.2d at 723 ; see also State v. Reiners , 664 N.W.2d 826, 831 (Minn. 2003). To protect these rights, the Supreme Court articulated a three-step analysis for determining whether racial discrimination motivated a peremptory challenge. Batson , 476 U.S. at 96-98, 106 S.Ct. 1712.
Under step one of the Batson analysis, the opponent of a peremptory challenge must make out a prima facie case of racial discrimination. State v. Blanche , 696 N.W.2d 351, 364-65 (Minn. 2005). The party that raises a Batson objection establishes a prima facie case of racial discrimination by showing "(1) that a member of a protected racial group has been peremptorily excluded from the jury and (2) that circumstances of the case raise an inference that the exclusion was based on race." Id. at 365.
If the objecting party establishes a prima facie case of racial discrimination, then under step two of the Batson analysis, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation." Blanche , 696 N.W.2d at 364. Finally, if a race-neutral explanation is given, then, under step three, the district court must determine whether the objecting party proved purposeful discrimination. Id. at 364-65.
A district court's ruling on a Batson challenge receives "great deference" because "the record may not reflect all of the relevant circumstances that the court may consider." Pendleton , 725 N.W.2d at 724 ; see also State v. White , 684 N.W.2d 500, 506 (Minn. 2004). Ordinarily, "[t]he district court's determination will not be reversed unless it is clearly erroneous." State v. Taylor , 650 N.W.2d 190, 201 (Minn. 2002). But when the district court makes its determinations using the wrong legal standard, "we will examine the record without deferring to the district court's analysis." Pendleton , 725 N.W.2d at 726 ; see Taylor , 650 N.W.2d at 202 (explaining that, when the district court "failed to follow the proper procedure at step two of the Batson analysis-that is, rather than determining whether each of the prosecutor's reason was race-neutral on its face , the district court analyzed whether the reasons were credible[-,]" we did not need to defer to the district court's step-two determinations); see also State v. Onyelobi , 879 N.W.2d 334, 347 n.11 (Minn. 2016) (explaining that the district court's failure to make its rulings sequentially at the conclusion of each step of the Batson analysis did not require us to alter our usual deferential standard of review because the district court did not conflate the legal standards for each step). We have said that "clarity at each step of the [ Batson ] analysis" is important because the objecting party "has the burden of proving a prima facie case, the proponent has the burden of production of a race-neutral explanation, and the [objecting party] has the ultimate burden of proving pretext and discriminatory intent." Reiners , 664 N.W.2d at 832.
Harvey argues that, in considering his objection to the State's peremptory challenge to Juror 18, the district court misapplied the Batson analysis and therefore the district court's determinations are subject to de novo review. According to Harvey, the district court misapplied Batson in three ways. First, Harvey contends that the district court impermissibly "allow[ed] the state to respond to, and inject extra *812 explanation into, Harvey's argument that he had made a prima facie case." Second, Harvey argues that "the district court erred by including the state's proffered reasons for the strike in its consideration of whether Harvey had made a prima facie case." Third, Harvey contends that "the district court erred by not weighing the supposedly race-neutral reason against other evidence in step three."
A.
Before turning to Harvey's arguments, we begin with the factual record developed about Juror 18, an African-American man. In his jury questionnaire, Juror 18 disclosed the following facts. Juror 18 was a tradesman who had lived in a suburb of Minneapolis for more than three decades. He had been the victim of a crime and knew someone who died a violent death. Juror 18 wrote that he had "negative" feelings about police officers generally and would give police officers "less" credibility than other witnesses. He believed that the criminal justice system works "well for some."
When Juror 18 was called, the district court asked him a number of questions. Defense counsel and the State both questioned Juror 18 regarding his experiences, ability to serve impartially, and perspective on a number of topics. Juror 18 stated that he "know[s] a couple of people that have died a violent death." Juror 18 had a friend who was robbed and murdered in Chicago around 2015. The victim was a family friend, and no person was ever arrested or prosecuted in relation to the robbery and murder. When defense counsel questioned Juror 18 regarding whether he would be able to separate this case and the murder of his friend, Juror 18 replied, "Well, I mean, and he's not the only person I know who was killed. So, I mean, I - you know, it's par for the course."
Juror 18 was robbed at gunpoint in the 1990s in Chicago. Regarding his experience being robbed, he said that he "ha[s] strong feelings about being robbed" and stated that the person who robbed him was never apprehended. When the district court prodded Juror 18 about his feelings and asked whether he could serve on the jury or if he "fe[lt] it would be too close to home[,]" he said, "I would think I could do it, you know ... Right, it is close to home. I mean, it's a sensitive - You know, it's not a subject I like to relive, but, I mean, it is what it is." And when the court asked Juror 18 whether he could separate his own experience and judge the case on its own, he replied, "I think I could judge this case on its own merit."
Regarding his experience of being robbed at gunpoint and the fact that no one was apprehended or prosecuted for the crime, Juror 18 said, "I didn't think [the police] would get anything back ... I just - I felt that I was just on the losing end of a robbery. And, you know, I didn't have any expectation for the police that they could swoop down and save the day and retrieve all our stuff." He further explained that "pretty much, until just a few moments ago, I just assumed everyone had been robbed before .... So I had just threw it as, you know, water off a duck's back ...." He acknowledged that "if it was a case without a robbery or murder, ... I probably would be less, you know, bringing personal feelings into it."
Juror 18 equivocated somewhat when defense counsel asked, "with all the experiences that you've had with the family friend and any other events, is it - is this case just not the right fit for you, in your mind?" He replied, "[a]fter the other day ... I was thinking about it ... and I was just like, hmm, you know. And when I filled out the questionnaire, I was like, oh. But, I mean, if I had to do it, I would think *813 I would be able to." Similarly, when asked if he could serve as a juror and apply the law fairly without allowing personal experiences to interfere, Juror 18 said, "Yeah. I would like to hope. I know that's not a good answer, but I would like to hope so, you know, to abandon your life experiences and that." Regarding whether he could be a fair juror, Juror 18 also said, "maybe this particular case brings a lot of things close to home to me that may make my mind run in different directions instead of staying on the path that, you know, that the prosecutor and the defendants are trying to get me to see ...." Juror 18 agreed that it would not be fair if his experiences affected his role as a potential juror, saying, "I definitely agree that wouldn't [be fair] ... I wouldn't want to be judged on something ... because of someone's bad experience [that was] similar...."
When asked about his response on the jury questionnaire indicating that his general feelings about police officers are "negative," Juror 18 recounted a negative experience as an eight-year-old when he was playing football in the alley with his friends. He said, "[t]he police drove past, stopped, came down there, told us all to lay on the ground. You know, [they] threw a bunch of racial slurs at us, took our football." Juror 18 explained that "[f]rom 15 years old, the police pulling us over, pulling their guns on us, dumping our - we went to McDonald's, dumping our food on the floor, calling us racial slurs. So I don't really think of them as super heroes and all of this stuff." Juror 18 also described a recent incident when he was pulled over and the police "asked where I was going, why am I around there" when he was in Minnetonka.
Regarding how he would judge officer credibility, Juror 18 said, "I wouldn't say I would just say all police officers are liars, but I just wouldn't say anything they say is the concrete truth. You know, I think they, you know, in [ ] self-preservation, they protect themselves."
When the State presented Juror 18 with a hypothetical scenario in which a police officer and a painter both testify, he said, "I don't hold the police in that they are above lying or above doing anything illegal." He said that police officers are comparable to other professions, "except they would lie for another person in their profession that they may not know. I don't think that [a] painter would lie for another painter that he didn't even know."
The State asked Juror 18, "How about when you saw the defendant, you saw he's being prosecuted by two white guys, did that stir any emotions or feelings for yourself?" He answered, "[n]ot really." And when asked about his statement on the questionnaire that the system works "well for some[,]" Juror 18 explained, "if you have enough money to hire the best attorneys and everything, it will work a little bit better for you than if you don't." When the State asked Juror 18, "[y]ou think an African-American man can get a fair trial in the United States?" Juror 18 replied, "[s]ure." The State also asked if Juror 18 would "have any axe to grind if [he] were chosen to sit on this jury[.]" And the State asked him, "what would [it] take" for an African-American man to get a fair trial? Juror 18 responded that it would "depend[ ] on the jury, how much money ... I hope it's not that it only happens ... a specific one way that a black guy could get a fair trial. But you [are] starting to scare me with that question." He continued, "I just think it depends on ... the jury, how stuff gets out in the press and stuff, you know. Different thing[s], the judge may let certain things in ... So I think he can [get a fair trial], but I think it can be skewed to get you."
*814 When the State asked Juror 18 about his belief that police officers are typically less credible, Juror 18 said, "Yeah. I think they will cover for one another." The State asked whether "that feeling spill[s] over beyond race," and Juror 18 interjected, "Well, yeah, that's - I didn't say anything about white police. I said police."
Juror 18 said that he would have liked to have seen the person responsible for robbing him punished and to recover his property and that he would have cooperated with the police to achieve that. He explained, "I'm not like the anti-law. I mean, I don't like crime just because I feel that the police got some shady stuff in their background. I would like to be able to walk the streets and not get robbed or anything." The State asked Juror 18 whether he would "weigh the testimony of police officers the same way as you would other people." He replied, "I think I could. I would - I think I would really pay close attention to what they say, you know." Then he said, "Yeah, I would. Yeah, I would. Yeah, like trying to double-check the facts and stuff, yes."
The State exercised a peremptory challenge to Juror 18, and defense counsel raised a Batson objection. Defense counsel argued, "I would challenge this Court to find more than, you know, five percent of the black population that doesn't find police to be ... that the police are not necessarily their friend." The district court noted that one African-American person was already seated on the jury and asked, "[W]here's your prima facie showing before you even get to the reason by the State ...?" The court went on to accurately summarize the analytical steps of Batson : "[a] [p]rima facie case is established by showing that, number one, a member of a protected racial group has been peremptorily excluded, which you would have. And, two, the circumstances of the case raise an inference that the exclusion was based on race." The court questioned whether the defense could satisfy the second prong of step one by raising an inference that the exclusion of the potential juror was based on his race. Specifically, the court asked: "How have you met that second prong for a prima facie showing? There's not - I mean, he - there's nothing - Is there anything about race that - Where is the race part?"
After noting that Juror 18 "[i]s a person of color," defense counsel argued that "[h]e's a guy who has a friend who was killed in a [sic] armed robbery just like this case, and it would be someone that the State would generally want to keep on but for race reasons." The district court acknowledged defense counsel's arguments and then turned to the State. After hearing the State's arguments, the district court stated that Harvey had not met his burden of showing a prima facie case at step one. In the alternative, it concluded that the State had satisfied its burden at step two of providing a race-neutral explanation for the strike. The court did not reach step three and denied Harvey's Batson challenge.
B.
Relying on Pendleton , Harvey argues that we should conduct a de novo review of the district court's Batson analysis. In Pendleton , we held that "the district court improperly conducted the Batson analysis" when the court allowed the State to respond to the defendant's argument at the first step before the court determined whether the defendant had established a prima facie case of racial discrimination. 725 N.W.2d at 725.
We distinguished Pendleton in Onyelobi , 879 N.W.2d at 347. There, the district court "did not immediately make a ruling at the conclusion of each prong, choosing *815 instead to first consider each of the three prongs" and "later made express findings, including that [the objecting party] had failed to establish a prima facie case of discrimination." Id. We reaffirmed that the "optimal procedure" is for the district court to "make its rulings sequentially at the conclusion of its consideration of each prong, including whether the challenger has established a prima facie case." Id. at 347 n.11. But we observed that the district court in Onyelobi , unlike the district court in Pendleton , "did not conflate the three prongs so as to obscure its discrete analysis of each prong." Id. Accordingly, we determined that "we need not alter our usual deferential standard of review." Id.
This case is more like Onyelobi than Pendleton . Harvey contends that the district court erred when it allowed the State to respond to Harvey's argument that he established a prima facie case of racial discrimination. It is true that, as in Pendleton , the district court turned to the State before clearly stating its determination whether Harvey had established both prongs of step one. But here, as in Onyelobi , the district court substantively applied the correct analysis to step one of Batson although it neglected to explicitly state its step-one determination before turning to the State.
Before hearing argument from the State, the district court and defense counsel had a lengthy exchange regarding whether Harvey could establish a prima facie showing of racial discrimination. Initially, Harvey argued that it would be difficult to find more than "five percent of the black population" that does not have negative feelings towards police officers. But the district court observed that one African-American venire member had already been seated, and that it was still early in the jury selection process. The fact that an African-American was seated on the jury was a proper consideration at step one of the Batson analysis. See, e.g. , State v. Wilson , 900 N.W.2d 373, 382 (Minn. 2017) ; see also Onyelobi , 879 N.W.2d at 345.
Moreover, the district court expressed strong skepticism that Harvey could meet the second prong of step one. The court asked defense counsel, "[h]ow have you met that second prong for a prima facie showing? There's not ... there's nothing - Is there anything about race that - Where is the race part?" The district court also noted that Juror 18 said police officers would "[l]ie for each other." Because law enforcement officers would be testifying for the State, it was appropriate at step one for the district court to consider the potential bias against the State based on Juror 18's comments about police credibility. Cf. Wilson , 900 N.W.2d at 383 (stating that, at step one of the Batson analysis, "[t]he district court also had to consider potential bias against the State based on [the prospective Juror's] beliefs that in practice the criminal justice system does not work as well as it might and that the United States incarcerates a disproportionate number of African-American men"); see also Angus v. State , 695 N.W.2d 109, 117 (Minn. 2005) (stating that the defendant's previous peremptory challenge to an African-American juror "was not probative of discriminatory motives on [the defendant's] part because the first African American venire member stricken by Angus had admitted an obvious bias by stating that his close relationship to police meant that he might favor police testimony and he was afraid he could not be fair"), abrogated on other grounds by Rivera v. Illinois , 556 U.S. 148, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009).
The other answer provided by Harvey-that Juror 18 was a robbery victim-was wholly insufficient to establish a prima facie showing of discrimination. Harvey provides *816 no authority for the proposition that the second prong of step one can be satisfied simply by suggesting a reason the State might have wanted Juror 18 to be seated. And we have never held that a venire member's status as a victim of a crime is sufficient to raise an inference of discrimination on the part of the State.
Based on our careful review of the record, it is clear that the district court rejected Harvey's argument that the circumstances of the case gave rise to an inference of racial discrimination. Although the district court did not expressly state its step-one determination before turning to the State, the record reflects that the court engaged in the appropriate analysis. Because the record strongly suggests that the district court rejected Harvey's argument at step one, the district court did not misapply Batson when it turned to the State before explicitly stating that Harvey had not established a prima facie case of discrimination. The facts that the district court considered, its accurate statement of the analysis at step one of Batson , and its questions to defense counsel regarding what facts could raise an inference of racial discrimination all support the conclusion that the district court conducted the proper step-one analysis.
To be sure, it is preferable for a district court to clearly state its analysis at each step of the Batson analysis. Clarity at each step ensures that the correct party is held to its burden. See Reiners , 664 N.W.2d at 832. But this case differs from Pendleton in a critical way. There, the district court heard the defendant's argument that the State's peremptory challenge of a prospective juror raised an inference of discrimination and then apparently allowed the State to respond with its reasons for challenging the juror. Pendleton , 725 N.W.2d at 724. Here, the district court did not simply passively listen to Harvey's arguments that he met his burden at step one and then listen to the State's arguments that it met its burden at step two. Rather, the district court actively engaged with Harvey for a prolonged exchange, expressing skepticism and asking questions about whether he could meet his burden at step one, stating the correct test at step one, and prompting Harvey repeatedly to point to facts that he argued raised an inference of discrimination. The district court listened to those arguments and ultimately determined that Harvey failed to raise the required inference.
Harvey next argues that the district court incorrectly applied Batson "by including the state's proffered reasons for the strike in its consideration of whether Harvey had made a prima facie case." This alleged error is closely related to the first error that Harvey alleged-that the district court improperly allowed the State to respond, at step one, to Harvey's argument that he established a prima facie case of racial discrimination.
The district court briefly addressed the State's arguments, saying, "I do believe it's an interesting issue," but then it said, "[b ]ut as you know under Batson, still, number one is the defense has to come up with a prima facie showing, which I think they failed to do here. " (Emphasis added.) The court further noted that it observed "nothing in the way that [the State] was questioning [Juror 18] that was any different than ... the way he was questioning any other juror."[17] It is true that the district *817 court waited until it heard from the State before making its step-one determination and that its analysis, to a certain extent, could be read as discussing both steps one and two at the same time. But nothing in our or the Supreme Court's Batson jurisprudence prohibits the district court from letting the State make arguments as to why the defense did not meet its burden at step one. Our careful review of the record convinces us that that was what the district court did here.
In sum, our review shows that the district court properly applied Batson at step one. Accordingly, here, as in Onyelobi , the "usual deferential standard of review" should apply. 879 N.W.2d at 347 n.11.[18]
If we determine, as we have, that the district court correctly applied Batson , then we "give great deference" to the district court's ruling on Harvey's Batson challenge. Pendleton , 725 N.W.2d at 724. Such deference recognizes "that the record may not reflect all of the relevant circumstances that the court may consider." Id. Based on our review of the record and consistent with our deferential standard of review, we conclude that the district court did not clearly err in ruling that Harvey failed to establish "a 'prima facie showing' that the State exercised its peremptory challenge against a prospective juror on the basis of race." State v. Diggins , 836 N.W.2d 349, 354 (Minn. 2013) (citation omitted).
Harvey made two arguments in an effort to meet his burden at step one of the Batson analysis. First, he argued that an overwhelming number of African-American people have negative feelings towards law enforcement, and therefore the State's exercise of its peremptory strike was discriminatory. Second, Harvey argued that Juror 18's status as a victim of a robbery and the friend of a murder and robbery victim should make him an appealing juror for the State.
In response to the first argument, the district court observed that one of the five jurors already seated was African American. And Juror 18's status as a victim of armed robbery and the friend of a murder and robbery victim did not raise an inference of discrimination. As discussed above, it was appropriate for the district court to consider the potential bias to the State based on Juror 18's statements that police officers would lie for one another. The district court also found that the State did not question Juror 18 differently than any other juror. The district court relied on considerations our cases have determined to be proper considerations at prong one of Batson . See Wilson , 900 N.W.2d at 383 (stating that, at step one of the Batson analysis, "[t]he district court also had to consider potential bias against the State *818 based on [the prospective juror's] beliefs that in practice the criminal justice system does not work as well as it might and that the United States incarcerates a disproportionate number of African American men"); Onyelobi , 879 N.W.2d at 348 (relying on the fact that another juror of color had been seated as support for the conclusion that the defendant had not met the burden at step one); White , 684 N.W.2d at 507.
Because the district court's determination is entitled to "great deference," see Pendleton , 725 N.W.2d at 724, and the court relied on considerations our cases recognize as proper, we conclude that the court did not err when it held that Harvey failed to make a prima facie showing of racial discrimination. We therefore hold that the district court did not commit reversible error when the court rejected Harvey's Batson challenge.[19]
IV.
We turn finally to issues that Harvey raises in his pro se brief. In his supplemental pro se brief, Harvey reasserts a number of claims that were already raised by counsel. In addition, Harvey asserts claims of ineffective assistance of trial counsel and prosecutorial misconduct. We consider each of his new claims in turn.
Harvey argues, in essence, that he received ineffective assistance of trial counsel because counsel did not effectively argue that the State's failure to obtain a valid warrant precluded the admission of the CSLI evidence. Because we have addressed and rejected the warrant issue on its merits, Harvey is not entitled to any relief on his claim of ineffective assistance of trial counsel. See, e.g. , State v. Davis , 820 N.W.2d 525, 539 n.10 (Minn. 2012) (determining that appellant's ineffective-assistance-of-counsel claims "are without merit because counsel's failure to raise meritless objections is not ineffective assistance of counsel"); Hannon v. State , 752 N.W.2d 518, 522 (Minn. 2008) (same).
Harvey also argues that the State committed prosecutorial misconduct when it obtained Harvey's CSLI evidence without a warrant and when it elicited the expert testimony regarding the GAR drive-test evidence. Because the CSLI evidence was properly obtained and the admission of the drive-test evidence was harmless, Harvey is not entitled to any relief on his claim of prosecutorial misconduct.
CONCLUSION
For the foregoing reasons, we affirm the judgment of conviction.
Affirmed.

In Batson v. Kentucky , the United States Supreme Court established a three-step analysis to determine whether the exercise of a peremptory challenge was motivated by racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. 476 U.S. 79, 89, 95-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

A ShotSpotter is gunshot-detection technology employed by police departments, including the Minneapolis Police Department. The technology consists of a series of acoustic sensors placed in different locations. When gunshots are detected by a ShotSpotter, data are sent to a remote server managed by a third party, which then conveys the location and time of the gunshots to the Minneapolis Police Department.

The first two rounds were recorded at 12:06:52 a.m., and the ShotSpotter indicated they were fired at 3554 Morgan Avenue North in Minneapolis. The ShotSpotter recorded three more rounds fired at 3550 Morgan Avenue North at 12:06:58 a.m. The ShotSpotter detected five more rounds fired in front of 3554 Morgan Avenue North at 12:07:19 a.m. The ShotSpotter recorded the final gunshot fired at 3554 Morgan Avenue North at 12:07:34 a.m.

A.A. positively identified a photograph of Harvey as Najee.

Agent Berni testified that GAR survey equipment is essentially an antenna that is attached to a vehicle, has built-in GPS capabilities, and is similar to a cell phone. A GAR can monitor and record data regarding what cellular tower and what sector of a cellular tower it can access from any given location. To obtain data for the drive test, Agent Berni testified that he drove a vehicle with a GAR along "streets and alleys" in the area. That data was mapped to determine the footprint of the cellular tower and sector accessed by Harvey's cell phone at the time of the shootings.

The term "Frye - Mack hearing" embodies the requirements of Frye v. United States , 293 F. 1013, 1014 (D.C. Cir. 1923) ("[T]he thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."), and State v. Mack , 292 N.W.2d 764, 768 (Minn. 1980) ("[T]he results [must be] scientifically reliable as accurate."). In 2006, these requirements were incorporated into Minn. R. Evid. 702. Doe v. Archdiocese of St. Paul , 817 N.W.2d 150, 165-68 (Minn. 2012).

M.W., the mother of Harvey's child, testified that she purchased a Chevy Malibu in the summer of 2015 from the automobile dealership Car Hop. Initially, the Chevy Malibu had a 21-day temporary permit, and, instead of state-issued license plates, the vehicle bore placards that said "Car Hop."

The jury found Harvey not guilty of the first-degree murder of Johnson while committing aggravated robbery and the first-degree attempted murder of A.A. while committing aggravated robbery.

Asserting that Harvey failed to raise his statutory argument in the district court, the State argues that he has forfeited appellate review of the statutory issue. A review of the record on appeal shows the following. Harvey's motion to suppress the CSLI evidence requested that the district court issue "an [o]rder suppressing all evidence obtained as the result of the unlawful warrantless search and seizure of cell phone records" under "U.S. Const. Amend. IV ; Minn. Const. Art. I, § 10 ; Minn. Stat. §§ 626A.28, 626A.42." In his supporting memorandum, Harvey also stated, "[t]he state statutes clarify that collection of any electronic communication data involving location information requires a warrant based on a finding of probable cause." Harvey cited Minn. Stat. §§ 626A.28 and 626A.42. Because Harvey's statutory argument fails on its merits, we need not decide whether the references to section 626A.42 were sufficient to preserve the statutory argument Harvey raises on appeal.

The district court captioned the document it signed as an order, not as a warrant. Section 626A.42 requires a "tracking warrant." But for purposes of the Fourth Amendment, the Supreme Court's precedent repeatedly and clearly states that what matters is: (1) the existence and adequacy of the probable-cause determination; and (2) that the determination is made by a neutral and detached magistrate. See Johnson v. United States , 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ; see also Gates , 462 U.S. at 240, 103 S.Ct. 2317. Both criteria are satisfied here. The affidavit submitted by Sergeant Villella provided the district court "with a substantial basis for determining the existence of probable cause." Gates , 462 U.S. at 239, 103 S.Ct. 2317. And Sergeant Villella's affidavit was, in fact, considered by a neutral and detached magistrate. Any error therefore in the label of the document is harmless beyond any reasonable doubt.

Under the two-pronged Frye -Mack standard, "[t]he district court must first determine whether the novel scientific evidence offered is generally accepted in the relevant scientific community. Second, the court must determine whether the novel scientific evidence offered is shown to have foundational reliability." State v. MacLennan , 702 N.W.2d 219, 230 (Minn. 2005) (citation omitted).

The district court also determined that Agent Berni was qualified as an expert and that his testimony would be helpful in assisting the jurors in understanding the evidence and determining facts. Harvey does not challenge these determinations on appeal.

In State v. Hull , the defendant argued that the district court improperly limited its examination of fingerprint and handwriting-analysis evidence to the second prong of Frye -Mack -foundational reliability. State v. Hull , 788 N.W.2d 91, 103 (Minn. 2010). The defendant contended that the district court was required to analyze the first prong because we had "never squarely held that either fingerprint analysis or handwriting analysis is generally accepted in the scientific community." Id. at 103-04. We declined to resolve this issue because we determined that "any error in the admission of either type of forensic evidence was harmless." Id. at 104. Harvey nevertheless relies on the statement in Hull that "lengthy use of a method by law enforcement, and even lengthy unquestioning acceptance by courts, does not [by itself] exempt expert evidence from scrutiny under the first prong of Frye -Mack . " Id. at 103 n.3 (alteration in original). Properly read, this statement relates to the general-acceptance standard and not the threshold novelty determination. But even if the statement could be read as relating to the novelty determination and not the general-acceptance standard, the statement was dictum.

Harvey argues that the State waived the question of whether CSLI is novel because it did not appeal the district court's pretrial order granting Harvey's motion for a Frye -Mack hearing. We disagree. The district court granted the motion for a Frye - Mack hearing, but the record does not show why the court ordered the hearing on the CSLI; the record simply contains an order summarily granting the motion. As Harvey noted in his memorandum in support of the hearing, even if the scientific technique at issue is not novel, as the State argued below, a Frye -Mack hearing could still be necessary to establish reliability.

Our research found one case in which a trial court considered drive-test evidence in the context of a standard similar to our Frye -Mack standard. Phillips v. State , 233 Md.App. 184, 163 A.3d 230, 234, 240 (2017) (deciding a question of appellate jurisdiction and referencing the trial court's conclusion that "law enforcement's use of drive tests for forensic purposes was novel and, thus, subject to the Frye - Reed [v. State , 283 Md. 374, 391 A.2d 364 (1978) ] reliability and admissibility standards," and that "the State did not establish that drive tests as used by the FBI are generally accepted in the digital forensic science community"). Although a number of other courts have considered drive-test evidence, they apply the Daubert standard, which we rejected in Goeb , 615 N.W.2d at 814. Those cases include United States v. Morgan , 292 F. Supp. 3d 475, 484-85 (D.D.C. 2018) (applying Daubert 's "flexible" standard and holding that drive-testing testimony, that included use of a GAR, was admissible "if the expert acknowledges that drive testing only produces an approximation of a cellphone's location and the expert adequately accounts for elements that could affect the test's accuracy" and noting that other courts have similarly concluded that "drive testing testimony is sufficiently reliable"); United States v. Davis , No. 11-60285-CR, 2013 WL 2156659, at *3-4 (S.D. Fla. May 17, 2013) (admitting FBI agent's testimony after applying the Daubert standard); State v. Montanez , 185 Conn.App. 589, 197 A.3d 959, 979, 981 (2018) (applying the Daubert standard and concluding that the trial court did not abuse its discretion in admitting drive-test expert evidence and noting that "[c]ertain federal courts have had occasion to consider the admissibility of drive test survey data under the Daubert standard, and have declined to find drive test data unreliable on the basis of a lack of scientific testing and publications"); State v. Adams , 161 A.3d 1182, 1194-96 (R.I. 2017) (affirming the admission of an FBI agent's cell-phone-location testimony, including a drive-test analysis, under the Daubert standard and "agree[ing] with the trial justice that [the agent's] expert testimony regarding cell phone towers was not novel"). But see United States v. Evans , 892 F. Supp. 2d 949, 955-57 (N.D. Ill. 2012) (declining to admit an FBI agent's testimony that relied on "granulization theory" to estimate the location of cell phones).

Agent Berni testified that the vast majority of cell phone towers in the United States are three-sector towers. This type of a tower is three-sided, with one sector on each side of the tower. The tower typically services 360 degrees around the tower, with each sector covering about 120 degrees. The CSLI data the State obtained from the service provider, Sprint, for Harvey's cell phone included the cell tower and cell sector ("cell site") that served the cell phone during its activity, including phone calls, text messages, and data events. Sprint also provided the latitude and longitude of the cell sites. With mapping software, the CSLI data and cell site locations were combined to map the approximate location of the cell phone during its activity.

We recognize that "[c]omparing prospective jurors who were struck and not struck can be an important step in determining whether a Batson violation occurred." Flowers v. Mississippi , --- U.S. ----, 139 S. Ct. 2228, 2248, 204 L.Ed.2d 638 (2019) ; see also Snyder v. Louisiana , 552 U.S. 472, 483-84, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). Here, however, the record does not show the race of other prospective jurors, aside from the African-American juror who was seated before Juror 18 was questioned.

Harvey also contends that "the district court erred by not weighing the supposedly race-neutral reason against other evidence in step three." But the district court need not reach step three if it properly determines that the proponent of the peremptory strike did not make a prima facie showing that the party exercising the strike was motivated by discrimination. See State v. White , 684 N.W.2d 500, 508 (Minn. 2004) (concluding that the district court did not clearly err in overruling an objection to a peremptory challenge when the court properly concluded that the proponent of the peremptory strike failed to establish a prima facie showing of discrimination). We need not address this argument because we conclude that the district court did not commit clear error when it determined that Harvey did not meet his burden at step one. See Wilson , 900 N.W.2d at 384 (ending Batson analysis after concluding that the district court did not clearly err in determining that the appellant failed to make a prima facie showing of discrimination at step one).

Our conclusion should not be read, however, as approval of certain questions of the prosecutor. At the time of his Batson objection, Harvey did not argue that an inference of discrimination could be drawn from any of the specific questions that the prosecutor asked Juror 18. As a result, he has forfeited appellate review of such an argument. State v. Hill , 871 N.W.2d 900, 903 n.1 (Minn. 2015) ("We generally do not consider issues that were not raised in the district court."). Nevertheless, we take this opportunity to caution against questioning that presumes something about a venire member based on his or her race. See Flowers v. Mississippi , --- U.S. ----, 139 S. Ct. 2228, 2246-47, 204 L.Ed.2d 638 (2019) (observing that the prosecutor engaged in "dramatically disparate questioning of black and white prospective jurors" and stating, "disparate questioning can be probative of discriminatory intent"). Asking only the African-American venire members if they would have an "axe to grind" could suggest that the questioner has presumed something about those jurors based solely on their race. During the jury selection process, we expect the court and counsel to engage in questioning that focuses on discovering actual, as opposed to presumed, biases.