STATE OF MINNESOTA

IN SUPREME COURT

A25-0152

Hennepin County                                                          Moore, III, J.

Cedric Lamont Berry,

        Appellant,

vs.                                                                      Filed:  April 8, 2026
                                                                         Office of Appellate Courts
State of Minnesota,

        Respondent.

_____

Cedric Lamont Berry, Oak Park Heights, Minnesota, pro se.

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Robert I. Yount, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

_____

S Y L L A B U S

The district court did not abuse its discretion by summarily denying appellant's postconviction petition without an evidentiary hearing because the undisputed facts alleged in the petition did not entitle him to relief as a matter of law.

Affirmed.

Considered and decided by the court without oral argument.

1

O P I N I O N

MOORE III, Justice.

In this first-degree murder case, appellant Cedric Lamont Berry asks us to decide whether the district court abused its discretion when it summarily denied his petition for postconviction relief without an evidentiary hearing. Berry's postconviction petition claims that his appellate counsel rendered ineffective assistance by not raising several specific claims on direct appeal, but Berry's petition did not allege facts that, if proven by a preponderance of the evidence at an evidentiary hearing, would entitle him to relief. Because Berry's ineffective assistance claims fail as a matter of law, we conclude that the district court did not abuse its discretion in denying Berry's postconviction petition without an evidentiary hearing. Accordingly, we affirm.

**FACTS**

This appeal arises from the kidnapping and murder of Monique Baugh and the non-fatal shooting of her boyfriend, J.M-M., on December 31, 2019. In connection with these crimes, a Hennepin County grand jury indicted appellant Cedric Berry and his accomplice Berry Davis on four charges: first-degree premeditated murder under Minn. Stat. § 609.185(a)(1); attempted first-degree premeditated murder under Minn. Stat. §§ 609.17, subd. 1, and 609.185(a)(1); kidnapping with intent to commit great bodily harm or terrorize under Minn. Stat. § 609.25, subd. 1(3); and felony murder during commission of a kidnapping under Minn. Stat. § 609.185(a)(3). The indictment alleged both principal and aiding-and-abetting theories of criminal liability on all counts. After a joint trial, a jury found Berry and Davis guilty as charged. The district court then entered judgments of

2

conviction and imposed prison sentences, which we affirmed on direct appeal. *See State v. Berry*, 982 N.W.2d 746 (Minn. 2022); *State v. Davis*, 982 N.W.2d 716 (Minn. 2022).

Our opinion resolving Berry's direct appeal provides a more complete description of the facts underlying the crimes. *See Berry*, 982 N.W.2d at 750–54. We therefore limit our discussion here to the facts below relevant to Berry's postconviction petition, which alleged that Berry's appellate counsel provided ineffective assistance for failing to argue that (1) the district court did not advise Berry of his procedural rights under the Minnesota Rules of Criminal Procedure; (2) there was insufficient evidence to prove the mental state elements for aiding and abetting first-degree premeditated murder; (3) the district court improperly instructed the jury on transferred intent; and (4) Berry's trial counsel was ineffective for failing to adequately address allegedly prejudicial material exposed to the jury.

***Pretrial Proceedings***

After the State filed its criminal complaint against Berry, the district court presided over a first appearance under Minn. R. Crim. P. 5.[1] The court immediately appointed a public defender present at the hearing to represent Berry. But the district court did not advise Berry of his procedural rights under Minn. R. Crim. P. 5.03,[2] nor did it ensure that

---

[1]    Among other things, Rule 5.01 requires the district court to inform the defendant at the first appearance of the charges, ensure the defendant has a copy of the charging document, and inform the defendant of their rights, including the right to have counsel appointed if eligible, and the opportunity to enter a plea. *See* Minn. R. Crim. P. 5.01.

[2]    Rule 5.03 includes an enumerated list of matters on which "[t]he court must advise the defendant." Minn. R. Crim. P. 5.03. These include the defendant's right to remain silent, rights to counsel and to communicate with counsel, and the right to a jury trial. *Id.*

counsel had advised Berry of those rights. Berry's attorney did not address, on the record, the district court's failure to advise Berry of those rights.

The district court subsequently presided over Berry's initial appearance on the indictment for first-degree and attempted first-degree premeditated murder as required by Minn. R. Crim. P. 19. The district court apparently did not ensure that Berry himself—as opposed to his attorney—had received a copy of the indictment as set forth in Rule 19.[3] *See* Minn. R. Crim. P. 19.04, subd. 2. Again, the district court did not advise Berry of his Rule 5.03 rights as directed by Rule 19, and Berry's counsel, who was present with him at the hearing, did not address that failure on the record. The district court determined that Berry and Davis would be tried together and denied Berry's pre-trial motion to sever the joint trial.

[3] Berry's claim under the Minnesota Rules of Criminal Procedure also cites Minn. R. Crim. P. 8, which governs second appearances on a criminal complaint and requires the district court to "again inform" the defendant of the charges and the defendant's rights, and "ensure the defendant has a copy of the complaint or indictment." Minn. R. Crim. P. 8.01(c). Here, however, the district court never held a second appearance under Rule 8 because the grand jury issued its indictment shortly after Berry's Rule 5 hearing, at which point Rule 19 governed subsequent pre-trial proceedings. *See* Minn. R. Crim. P. 19 cmt (noting that "Rule 19 reflects the necessary differences between the procedures under an indictment and under a complaint"). It is possible that Berry's reference to a Rule 8 hearing was intended to refer to a first appearance on the indictment under Rule 19.04. In any event, the crux of Berry's claim is that the district court did not strictly comply with the procedural rules governing the first appearances on his criminal charges, including by failing to ensure that Berry personally received a copy of the charging documents. Accordingly, consistent with our general practice of construing claims raised in pro se postconviction petitions "liberally and with an understanding eye," *Andersen v. State*, 940 N.W.2d 172, 181 (Minn. 2020), we treat Berry's Rule 8 claim as an analogous claim under Rule 19. *See* Minn. R. Crim. P. 19.04, subd. 2 (providing that a defendant appearing for the first time on an indictment "must be advised of the charges" and that the district court "must also advise the defendant in accordance with Rule 5.03 (Statement of Rights)").

4

*The State's Case*

At trial, the State produced considerable circumstantial evidence linking Berry to the shooting of J.M-M. and the kidnapping and eventual murder of Baugh. For purposes of this appeal, the most critical facts proven by the State are as follows.

The State's evidence included surveillance video showing Berry buying a burner phone under a fake name ("set-up" phone). Cell site location information (CSLI) data placed Berry's personal cellphone in the store at the time of purchase of the set-up phone. CSLI data showed Berry then traveled with Davis and Lyndon Wiggins to Elsa Segura's address. Berry, Davis, and Wiggins left the set-up phone with Segura, who then used the set-up phone to lure Baugh to a sham real estate showing at the Maple Grove home where she was later kidnapped. The set-up phone was never used for any other purpose.

CSLI data also showed that Berry and Davis traveled together to Walmart in the days leading up to the shootings. Store surveillance footage showed Davis buying a pair of Midland two-way radios, ammonia, and bleach. The day of the murder, Berry procured the rental U-Haul truck used to kidnap and transport Baugh.

Later that day, around 2:30 p.m., Berry and Davis left their cell phones at an address in North Minneapolis. About thirty minutes later, Baugh arrived at the Maple Grove house for the sham showing and entered the house. Home security cameras in the neighborhood repeatedly captured the U-Haul circling the house just before and shortly after Baugh's arrival. The U-Haul backed up to the house with the cargo door facing the garage, two men entered through the front door, and then exited through the garage with what looks

5

like a person. None of the footage shows Baugh leaving the house. Her car was left in the driveway, and she was never seen alive again.

Around 5:40 p.m. that same day, surveillance footage and eyewitnesses placed the U-Haul near a North Minneapolis address where J.M-M. and Baugh were staying temporarily. Aside from J.M-M., Baugh, and Baugh's mother, no one else knew Baugh and J.M-M. were staying at that location. J.M-M. testified that a masked Black male entered the house with Baugh's housekey, shot J.M-M. several times, and fled, leaving the housekey behind. J.M-M. described the shooter as wearing a black ski mask with one hole for eyes. Investigators later found a mask matching that description in Berry's vehicle.

About fifteen minutes after J.M-M. was shot, activity on Berry's and Davis's cell phones resumed and the phones began traveling together. Cell phone data shows Berry's phone placing an outgoing call to Berry's wife around 5:55 p.m., suggesting that Berry was in physical possession of his phone at that time. Between around 5:55 and 6:30 p.m., various city surveillance cameras and license plate readers captured the U-Haul and Berry's vehicle traveling together between the North Minneapolis location where J.M-M. was shot and the Minneapolis alley where Baugh was eventually murdered. CSLI data from Berry's and Davis's phones matched the vehicles' movements. Cameras and witnesses place the U-Haul driving into the alley while Berry's vehicle parked close by.

A ShotSpotter device[4] near the Minneapolis alley detected a three-round burst of gunshots at 6:37 p.m., the exact time that CSLI data placed Berry's phone in the alley.

---

[4] ShotSpotter devices employ acoustic sensors to detect gunfire and automatically alert law enforcement as to the location of the gunshots. Many police departments,

6

Police found Baugh dead in the same alley shortly thereafter. She had been shot three times at point-blank range, including once in the temple, with the same gun used to shoot J.M-M. Investigators found duct tape wrapped around Baugh's wrist and neck and later matched Berry's fingerprints to five prints lifted from the adhesive, interior side of the tape used to bind Baugh's neck. When processing the U-Haul, investigators recovered zip-ties, black gloves, and duct tape packaging in the cargo area. They also found Baugh's blood, fingerprints, and several of her acrylic fingernails that had been ripped off. Multiple witnesses noted that the truck reeked of bleach and ammonia, which can be used to destroy DNA evidence. Still, analysis of a DNA mixture recovered from the zip ties could exclude 99.995% of the general population—but not Berry—as a source of DNA.

Following Berry's arrest, law enforcement seized his vehicle and recovered an opened roll of duct tape matching the brand of packaging found in the U-Haul, a pair of Midland two-way radios, and a black ski mask with a single eye hole. Although Berry had no personal connection to Baugh before the crimes, investigators found a picture of Baugh saved on Berry's phone. Berry's phone had searched for "gun stores in Indiana." Investigators also discovered an envelope with the name "Monique Baugh" handwritten on the front in the trash outside an address where Berry was known to stay. He later asked his cousin to retrieve a gun from that same address during a jailhouse call following his arrest.

---

including the Minneapolis Police Department, use this technology. *See State v. Harvey*, 932 N.W.2d 792, 797 n.2 (Minn. 2019).

### *Closing Arguments and Jury Instructions*

The State's closing argument portrayed Berry and Davis as principals in the kidnapping and shootings, with Berry being the likely shooter. In the alternative, the State argued that the jury could also find Berry guilty of the charged offenses on an aiding-and-abetting theory even if they could not conclude he was the shooter beyond a reasonable doubt. According to the State, even if Davis acted as the principal, Berry intentionally and substantially participated in the planning and execution of the crimes. The district court gave the jury the model instruction on aiding-and-abetting liability that applied to all charges. That instruction stated the jury could find Berry guilty if they concluded that he "aided" or "conspired with another or otherwise procured the commission of a crime by another person and the crime was committed." The jury instructions on each individual charge clarified that aiding-and-abetting liability requires that the defendant play an "intentional role in aiding the commission of the crime." That in turn required the jury to conclude that Berry "knew another person was going to commit or was committing [the] crime[s]" and "intended that his presence or actions aid in the commission of th[ose] crime[s]." On the premeditated murder charge specifically, the district court also gave the jury the model instruction on transferred intent, which allowed the jury to conclude that the intent element of first-degree premeditated murder was satisfied "[i]f the defendant acted with premeditation and with the intent to cause the death of a person other than the deceased." Berry's trial counsel did not object to any of these instructions.

Then, shortly after the jury retired for deliberations, Berry notified his counsel that members of the prosecution team were wearing bracelets that read "Forever Monique"

8

during closing arguments, similar to the bracelets worn by Baugh's family in court throughout the trial. After notifying the court and providing the district court judge a sample bracelet to inspect, Berry's counsel moved for a mistrial, characterizing this as "improper" prosecutorial conduct that may have prejudiced the jury. The district court denied the motion, stating on the record:

> I did not notice the bracelet at all or that any of the family members are wearing it. It's clear that it's so small, you can't even read it from a distance. I think it would have been wise for the State not to have it on, just to be as cautious as possible, but I don't think it creates a mistrial or any unnecessary process.

Counsel accepted this ruling without requesting a hearing to determine whether any of the jurors had seen or read the bracelets under the procedure announced in *Schwartz v. Minneapolis Suburban Bus Co.*, 104 N.W.2d 301 (Minn. 1960), known as a "*Schwartz* hearing." *See State v. Jackson*, 977 N.W.2d 169, 170 & n.1 (Minn. 2022).

The jury ultimately found Berry guilty on all counts. Accordingly, the district court entered judgments of conviction for first-degree premeditated murder, attempted first-degree premeditated murder, and kidnapping, and later sentenced Berry to life in prison without the possibility of release.[5]

### *Appeal and Postconviction Proceedings*

Berry then appealed his conviction, raising three main issues. *See Berry*, 982 N.W.2d at 754–55. His appellate counsel primarily argued that the district court committed reversible error by not holding a *Frye-Mack* evidentiary hearing on the

---

[5] The district court left the felony murder charge unadjudicated as a lesser-included offense.

admissibility of the CSLI data that the State repeatedly used to establish Berry's whereabouts and personal participation in the crimes. *Id.* at 755–58. Counsel also argued that the district court committed prejudicial error when it denied the defendants' repeated motions to sever their joint trial and also when it denied Berry's motion for additional peremptory challenges during jury selection. *Id.* at 758–61. Concluding that these arguments did not warrant relief, we affirmed. *Id.* at 750.

Berry then timely petitioned for postconviction relief in Hennepin County district court, asserting several ineffective-assistance-of-appellate-counsel claims.[6] Berry argued that appellate counsel rendered ineffective assistance by failing to challenge the sufficiency of the State's evidence proving that he knew his alleged-accomplices would murder Baugh and intended his actions to further the commission of that crime. Berry also argued that appellate counsel was ineffective by not arguing that the district court committed plain error when it instructed the jury on transferred intent. Next, Berry claimed that appellate counsel was ineffective by failing to assert violations of Minnesota Rules of Criminal Procedure 5 and 8 arising from the district court's failure to advise him of his procedural rights at his first appearances. Finally, Berry appeared to argue that appellate counsel rendered ineffective assistance by failing to bring ineffective assistance of *trial* counsel claims based on trial counsel's alleged failure to (1) properly object to the prosecution

---

[6] The limitations period for filing a petition for postconviction relief is two years after an appellate court's disposition of the direct appeal. Minn. Stat. § 590.01, subd. 4(a)(2). We decided Berry's direct appeal on December 21, 2022, and Berry filed his postconviction petition on August 7, 2024.

10

wearing the "Forever Monique" bracelets; and (2) request a *Schwartz* hearing to determine whether the jury was exposed to this allegedly prejudicial material.

Berry's petition relied exclusively on the district court transcripts and briefing on appeal; he did not include affidavits or make new factual allegations. Berry's petition requested a new trial, or, alternatively, an evidentiary hearing. For its part, the State did not contest that Berry's appellate counsel did not make the other arguments Berry raised in his petition.

The district court agreed with the State, however, that even when the transcripts and briefing on appeal are viewed in the light most favorable to Berry, he was conclusively entitled to no relief under the standard for ineffective assistance of counsel announced in *Strickland v. Washington*, 466 U.S. 668 (1984). Concluding that the petition did not raise factual allegations that would entitle Berry to relief even if proven at an evidentiary hearing, the district court summarily denied the petition. This appeal followed.

## ANALYSIS

We review a district court's denial of a postconviction petition for abuse of discretion. *Erickson v. State*, 842 N.W.2d 314, 318 (Minn. 2014). Generally, a postconviction court abuses its discretion when it acts "in an arbitrary or capricious manner, base[s] its ruling on an erroneous view of the law, or ma[kes] clearly erroneous factual findings." *Heard v. State*, 22 N.W.3d 154, 159 (Minn. 2025) (citation omitted) (internal quotation marks omitted). In determining whether an evidentiary hearing is required, a postconviction court must accept "the facts alleged in the petition as true and construe[] them in the light most favorable to the petitioner." *Brown v. State*, 895 N.W.2d

11

612, 618 (Minn. 2017). And where, as here, a petitioner is self-represented, we construe claims raised in the petition "liberally and with an understanding eye." *Andersen*, 940 N.W.2d at 181.

Still, the petitioner bears the ultimate burden to allege *facts* entitling him to relief; he "must do more than offer conclusory, argumentative assertions, without factual support." *State v. Turnage*, 729 N.W.2d 593, 599 (Minn. 2007). A postconviction court may therefore deny a petition without an evidentiary hearing if "the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1. That is true if the alleged facts—even when taken as true— are "insufficient to grant the requested relief" as a matter of law. *Davis v. State*, 15 N.W.3d 635, 642 (Minn. 2025) (citation omitted) (internal quotation marks omitted).

Although the overarching standard of review of a district court's summary denial of a postconviction petition is abuse of discretion, we review the merits of any underlying ineffective-assistance-of-counsel claims de novo. *Pearson*, 891 N.W.2d at 60. To succeed on an ineffective-assistance-of-counsel claim raised in a postconviction petition, the defendant must allege facts that, if proven by a preponderance of the evidence, meet the two-prong test for ineffective assistance set out in *Strickland*, 466 U.S. at 687. Here, the only *factual* allegation in the petition is that appellate counsel failed to raise the claims Berry describes. The State does not dispute that allegation. Thus, we need only decide whether appellate counsel's failure to—or decision not to—bring these claims is ineffective assistance as a matter of law. We therefore review the *Strickland* test, as developed in our case law, before applying this test to each of Berry's ineffective assistance claims in turn.

12

To provide effective assistance, counsel must exercise the same level of skill and diligence that a reasonably competent attorney would under the circumstances. *State v. Gassler*, 505 N.W.2d 62, 70 (Minn. 1993). Accordingly, *Strickland*'s first prong requires the petitioner to show that counsel's performance was deficient when judged against "an objective standard of reasonableness" (the "performance prong"). *Fields v. State*, 733 N.W.2d 465, 468 (Minn. 2007) (quoting *Strickland*, 466 U.S. at 687–88) (internal quotation marks omitted). Appellate counsel need not raise all possible issues to meet that standard. To the contrary, requiring appellate counsel to raise every "colorable" claim rather than weeding out weaker ones disserves the goal of "vigorous and effective advocacy." *Jones v. Barnes*, 463 U.S. 745, 754 (1983); *see also Jackson v. State*, 817 N.W.2d 717, 724 (Minn. 2012). Thus, in evaluating the performance prong, appellate counsel may decline to raise claims that they could have reasonably concluded would not prevail—counsel only has a duty to bring the "most meritorious" claims on appeal. *E.g.*, *Zornes v. State*, 880 N.W.2d 363, 371 (Minn. 2016). And we employ a "strong presumption" that appellate counsel exercised reasonable professional judgment in selecting which issues to raise. *Id.*; *Davis*, 15 N.W.3d at 647.

Along with showing that counsel's performance was defective, *Strickland* also requires the petitioner to establish prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the "prejudice prong"). *Peltier v. State*, 946 N.W.2d 369, 373 (Minn. 2020) (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Leake v. State*,

767 N.W.2d 5, 10 (Minn. 2009) (citation omitted) (internal quotation marks omitted).  Put differently, "a defendant must show that counsel's errors actually had an adverse effect." *Id.* (citation omitted) (internal quotation marks omitted).

We recognize that *Strickland*'s two prongs may overlap when evaluating appellate counsel's performance.  Because effective appellate advocacy often involves "weeding out" weaker claims, counsel may reasonably decline to raise an issue precisely *because* she does not believe it has a reasonable probability of success.  *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).[7]  Still, we may analyze these two prongs in either order.  If we determine that the factual allegations in the petition do not satisfy either the performance prong or the prejudice prong, we may "dispose of a claim on one prong without considering the other."  *Peltier*, 946 N.W.2d at 372 (citation omitted) (internal quotation marks omitted).

If, on de novo review, we conclude that the postconviction court correctly applied the *Strickland* test and reached the proper result, then the court did not rely on an erroneous view of the law or the facts and therefore did not abuse its discretion by denying the petition without an evidentiary hearing.  *See Pearson*, 891 N.W.2d at 596.

---

[7]     As the *Miller* court put it:

> [E]very weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court . . . .  For these reasons, a lawyer who throws in every arguable point—'just in case'—is likely to serve her client less effectively than one who concentrates solely on the strong arguments.

882 F.2d at 1434.

14

A.

With the applicable law and standard of review in mind, we now consider Berry's specific ineffective assistance claims. To begin with, Berry contends that his appellate counsel rendered ineffective assistance by failing to challenge the sufficiency of the State's evidence establishing beyond a reasonable doubt that he knew his accomplices planned to murder Baugh and J.M-M. and intended his actions to aid the commission of those crimes—the mental state requirements for aiding-and-abetting liability. We disagree.

Appellate counsel's decision not to raise a sufficiency-of-the-evidence challenge does not fall below *Strickland*'s objective standard of reasonableness for two reasons. First, appellate counsel does not act unreasonably by declining to challenge the sufficiency of the evidence supporting an aiding-and-abetting theory when the State presented sufficient evidence of *principal* liability. Here, it is far from clear that the jury based its verdict on an aiding-and-abetting theory of criminal liability rather than a principal one. The State's primary theory of the case characterized Berry as a principal, and its evidence supported that theory. The ski mask found in Berry's vehicle matched J.M-M.'s description of his shooter. Investigators identified a likely match between Berry's DNA and a DNA profile found on the zip-ties recovered from the back of the U-Haul. Berry's fingerprints matched five partial prints lifted from the *interior*, adhesive side of the duct tape found wrapped around Baugh's neck, which would be physically impossible unless Berry personally unwrapped or handled that portion of the tape. Berry was present at the murder scene at the exact time Baugh was shot. Only one gun was used in both shootings. And although investigators never recovered the murder weapon, Berry had searched before

15

for "gun stores in Indiana" and was recorded instructing a family member to retrieve a gun from the garage of a house at which he was known to stay.

Reviewing this evidence alongside the more general evidence linking Berry to the preparatory steps and crime scenes discussed above, it would not have been objectively unreasonable for appellate counsel to conclude that the jury had sufficient evidence to convict Berry *as a principal*. Thus, the sufficiency of the evidence proving Berry's mental state in relation to aiding and abetting would have been irrelevant. *See Allwine v. State*, 994 N.W.2d 528, 537 (Minn. 2023). And for all the same reasons, appellate counsel could have reasonably concluded that the State had sufficient evidence to prove that Berry intentionally aided the commission of the crimes, even if the jury could have theoretically concluded that Davis, not Berry, pulled the trigger.

Second, counsel *did* raise an evidentiary challenge to the admissibility of the State's CSLI evidence, which was critical to establishing Berry's personal participation in the crimes. Although the State had other evidence establishing that Berry purchased the set-up phone and procured the rental U-Haul truck used to kidnap and transport Baugh, the CSLI data proved that Berry delivered the set-up phone to Segura, traveled with Davis to buy the radios, ammonia, and bleach, followed the U-Haul transporting Baugh between J.M-M.'s house and the murder scene, and was present in the alley at the exact time of the murder. Berry's phone placed an outgoing call to his wife approximately 40 minutes before Baugh's shooting, implying that Berry was in physical possession of his phone when she was murdered. No other evidence placed Berry *himself*, rather than just his vehicle, at the scene of either shooting or other key locations.

16

Moreover, our consideration of CSLI evidence was relatively new at the time of Berry's direct appeal, having been addressed in only three of our prior opinions: *State v. Garland*, 942 N.W.2d 732 (Minn. 2020); *State v. Harvey*, 932 N.W.2d 792 (Minn. 2019); and *State v. Smith*, 932 N.W.2d 257 (Minn. 2019). These decisions also came in the wake of the United States Supreme Court's landmark decision in *Carpenter v. United States*, 585 U.S. 296 (2018), which altered the admissibility of CSLI evidence by recognizing a privacy interest in cellular location information and holding that accessing historical CSLI data constitutes a search requiring a probable cause determination under the Fourth Amendment. *Id.* at 316–19. Although *Harvey* held that a *Frye-Mack* hearing was not required to decide the admissibility of CSLI evidence, Berry's appellate counsel vigorously challenged the admissibility of CSLI evidence under Minn. R. Evid. 702 without a hearing on the questions of whether it (1) is based a novel or emerging scientific theory; and (2) had foundational reliability. *See Berry*, 982 N.W.2d at 755–56. Given the evolving law governing the admissibility of CSLI at the time, it would not have been objectively unreasonable for Berry's counsel to conclude that focusing on excluding the CSLI evidence—rather than challenging the sufficiency of the evidence as a whole—offered the best prospect of acquittal at retrial. *See Allwine*, 994 N.W.2d at 537 (holding appellate counsel "was permitted to argue only the most meritorious claims" on direct appeal). Indeed, disqualifying the CSLI evidence would have made a sufficiency challenge to the State's *remaining* evidence far stronger. Our rejection of counsel's arguments to that end on direct appeal does not alter this conclusion.

17

For those reasons, Berry cannot overcome our strong presumption that appellate counsel exercised reasonable professional judgment in electing to challenge the admissibility of the CSLI evidence, rather than the sufficiency of the evidence proving Berry's mental state in relation to aiding and abetting. *See Zornes*, 880 N.W.2d at 371. Berry's ineffective assistance claim on this ground therefore fails as a matter of law because even if the facts alleged in his postconviction petition were proven by a preponderance of the evidence at a postconviction evidentiary hearing, they fail to establish that counsel's decision not to raise this sufficiency-of-the-evidence claim fell below *Strickland*'s objective standard of reasonableness.

B.

Next, Berry claims that appellate counsel rendered ineffective assistance by failing to challenge the district court's transferred-intent instruction given in connection with the premeditated murder charge. Berry's arguments on this issue are not clearly developed and somewhat difficult to follow. He appears to assert that the instruction was erroneous because these facts do not implicate the typical transferred-intent scenario where, for example, the defendant intended to shoot one person but accidentally shot another. Berry argues the transferred-intent instruction was erroneous because Baugh and J.M-M. were both *intended* victims of separate shootings. But Berry also seems to argue that the transferred-intent instruction prejudicially affected the jury's verdict because it could have improperly allowed the jury to infer intent to kill Baugh from intent to kill J.M-M. *or* infer intent to kill J.M-M. from intent to kill Baugh.

18

Berry forfeited direct appellate review of this issue because his trial counsel did not object to the instruction. *See State v. Gilleylen*, 993 N.W.2d 266, 280 (Minn. 2023). Thus, we could have provided relief only under the plain-error exception to our forfeiture doctrine. *Id.* Appellate counsel would have had to establish that the district court's decision to instruct the jury on transferred intent was "(1) error; (2) that is plain; and (3) . . . affect[ed] substantial rights." *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998); *see also Gilleylen*, 993 N.W.2d at 280. And even if Berry could have carried the "heavy burden" of showing that "there is a reasonable likelihood" that an error in the jury instructions had a "significant effect on the verdict of the jury," *Griller*, 583 N.W.2d at 741 (citation omitted) (internal quotation marks omitted), we could have granted a new trial only if failure to do so would have "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *See State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)) (internal quotation marks omitted). Assuming without deciding that giving the transferred-intent instruction was erroneous on these facts, Berry's ineffective assistance claim still fails as a matter of law because it would not have been objectively unreasonable for counsel to conclude that a plain-error challenge to the jury instructions would have failed, at least at the third prong of the analysis regarding the error affecting substantial rights.

Any error in giving the transferred-intent instruction on the premeditated murder charge would not have affected Berry's substantial rights as to the attempted-murder charge involving J.M-M. No reasonable jury could have inferred intent to kill J.M-M. from intent to kill Baugh because the district court did not include the transferred-intent

19

instruction in the jury instructions on the attempted-murder charge. *See State v. Gatson*, 801 N.W.2d 134, 151 (Minn. 2011) (noting our presumption that "juries follow instructions given by the court" (citation omitted) (internal quotation marks omitted)). Even if the jury had somehow thought the transferred-intent instruction was applicable to the attempt charge, it is logically impossible for intent to kill Baugh to transfer to a shooting that occurred around 45 minutes earlier and in an entirely different location. Intent to perform an action occurring later in time simply cannot apply retroactively to previous action.

Likewise, any error in giving the transferred-intent instruction on the premeditated murder charge did not affect Berry's substantial rights because any finding of intent to kill J.M-M. could not have impacted the jury's finding of intent to kill Baugh. As Berry now concedes: "Baugh was shot three times, including once from point-blank range in the temple, leaving little doubt that her killing—if not premeditated—was intentional." *Cf. State v. Barshaw*, 879 N.W.2d 356, 363–64 (Minn. 2016) (explaining that intent to kill can be inferred from planning activity and the nature of the killing). Berry therefore acknowledges that, at that moment, the shooter intended to kill Baugh—not J.M-M.

Berry's concession that Baugh's killing was intentional also dooms any argument that failure to grant a new trial based on the allegedly erroneous instruction on direct appeal might have "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *See State v. Pulczinski*, 972 N.W.2d 347, 356 (Minn. 2022). Berry has acknowledged, both in his postconviction petition and in this appeal, that Baugh was killed intentionally by three shots, including a point-blank shot to her temple. Thus, a reasonable appellate lawyer could conclude that a plain-error challenge to a surplus jury instruction

20

that did not affect Berry's substantial rights would fail because affirming Berry's conviction for an intentional killing would not cause the public to "seriously question whether our court system has integrity and generally offers accused persons a fair trial." *Id.*

Because Berry's appellate counsel could have "legitimately concluded" that a plain-error challenge to the transferred-intent instruction would not have prevailed, counsel's decision not to bring this claim would not fall below *Strickland*'s objective standard of reasonableness even if the facts alleged in his postconviction petition were proven by a preponderance of the evidence at a postconviction evidentiary hearing. *See Zornes*, 880 N.W.2d at 371. Berry's ineffective assistance claim on this basis therefore fails as a matter of law.

C.

Next, we turn to Berry's ineffective assistance claim based on appellate counsel's decision not to raise the district court's alleged failure to advise Berry of his procedural rights under Minn. R. Crim. P. 5 and 8 on direct appeal. Rule 5 governs a defendant's first appearance on a criminal complaint. The rule requires a district court to inform a defendant of the charges, *Miranda* rights, the right to communicate with counsel, and the right to a jury trial, and to ensure the defendant has a copy of the complaint. *See* Minn. R. Crim. P. 5.01, 5.03. And Rule 19, which applies to first appearances on an indictment, references the rights colloquy from Rule 5.03. Minn. R. Crim. P. 19.04, subd. 2. Rule 19 also requires the district court to ensure that the defendant has a copy of the indictment. *See* Minn. R. Crim. P. 19.02, subd. 2, 19.04, subd 2 ("If the defendant has not received a copy of the

21

indictment, the defendant must be provided with one."). While seemingly conflating Rule 8 and Rule 19 requirements, Berry argues that the district court's overall apparent failure to provide these advisories and personally provide him with a copy of the charging documents violated his Fourteenth Amendment due process rights. But because Berry's trial counsel did not address the district court's alleged failures during these proceedings, our review on direct appeal would have been limited by the plain-error doctrine.

Berry's Rule 5 and 8 claims fail to satisfy *Strickland*'s prejudice prong as to the effect of his appellate attorney not raising this issue on direct appeal. The undisputed facts alleged in his postconviction petition do not establish a "reasonable probability" that a plain-error challenge to these alleged rule violations would have changed the outcome of his direct appeal. *See Peltier*, 946 N.W.2d at 372. Even assuming the district court failed to advise Berry of his rights and provide him with a copy of the indictment as required by Rules 5 and 19, Berry was represented by counsel at his first appearance and at all subsequent proceedings, including his first appearance on the indictment under Rule 19. We therefore presume that *counsel* advised him of those rights and received copies of the relevant charging documents on Berry's behalf. *See State v. Lorentz*, 276 N.W.2d 37, 38 & n.2 (Minn. 1979) ("[E]ven without an express representation by defense counsel that he had advised the defendant of his rights, one may properly presume that counsel had given such advice." (citing *Henderson v. Morgan*, 426 U.S. 637, 647 (1976)). And Berry does not allege—either in his petition or in an affidavit—that counsel failed to advise him of those rights, that he was unaware of his rights, or that those rights were ever violated. To the contrary, Berry understood his rights to counsel and to a jury trial because he in fact

exercised them, and he does not otherwise explain how the court's apparent failure to advise him of his rights affected the result of his trial. Berry cites no authority holding that a non-prejudicial failure to advise a represented defendant of their rights or to ensure that such a defendant has personally received a copy of the charging document violates the due process clauses of the federal or state constitutions, and we have found none. Berry therefore has not shown a reasonable probability that the alleged error significantly affected the jury verdict, and thereby his substantial rights. *See Griller*, 583 N.W.2d at 741; *Gilleylen*, 993 N.W.2d at 280–81.

Even if the facts alleged in Berry's postconviction petition regarding Rules 5 and 8 were proven by a preponderance of the evidence at a postconviction evidentiary hearing, they would fail to establish a reasonable probability that a plain-error challenge to these procedural violations would have succeeded on direct appeal. *See State v. Ezeka*, 16 N.W.2d at 779–80. Berry's ineffective assistance of counsel claim based on appellate counsel's decision not to raise such a challenge therefore fails as a matter of law.

D.

Finally, we consider Berry's claims related to the "Forever Monique" bracelets worn by the prosecution during closing arguments. Berry appears to argue that appellate counsel rendered ineffective assistance by not raising two related ineffective-assistance-of-trial-counsel claims. To succeed on a claim that appellate counsel was ineffective in failing to raise an ineffective-assistance-of-trial-counsel claim, the petitioner "must first show that his trial counsel was ineffective," again under the *Strickland* test. *Schneider v. State*, 725 N.W.2d 516, 521 (Minn. 2007). According to Berry, trial counsel provided

23

ineffective assistance by failing to (1) properly object to the prosecution wearing the bracelets during closing arguments; and (2) move for a post-trial *Schwartz* hearing, which "provides a party an opportunity to impeach a verdict due to juror misconduct or bias." *See Pulczinski*, 972 N.W.2d at 361. As in the context of appellate advocacy, however, "[w]e presume that trial counsel's performance was reasonable and we give particular deference to trial strategy." *Schneider*, 725 N.W.2d at 521; *see also Opsahl v. State*, 677 N.W.2d 414, 421 (Minn. 2004).

Berry has not alleged facts showing that trial counsel rendered ineffective assistance by failing to object to the prosecution's wearing of the bracelets. This claim fails immediately at *Strickland*'s performance prong because trial counsel *did* move for a mistrial on this very basis. Berry articulates no problems with the timing and form of trial counsel's motion, but even if he did, *appellate* counsel could have reasonably concluded that the specifics of trial counsel's motion were trial strategy that would have been entitled to "particular deference" on appeal. *See Schneider*, 725 N.W.2d at 521. District courts also have considerable discretion in denying a mistrial motion because the judge is best suited to "determine whether an error is sufficiently prejudicial to require a mistrial." *State v. Griffin*, 887 N.W.2d 257, 262 (Minn. 2016). Thus, given the district court's express ruling on the record that jurors most likely did not see—and almost certainly could not read—the bracelets from the jury box, appellate counsel could have "legitimately concluded" that an ineffective assistance of trial counsel claim on this basis would also fail at *Strickland*'s prejudice prong. *See Zornes*, 880 N.W.2d at 371.

24

The second ineffective-assistance-of-trial-counsel claim raised in Berry's petition would have failed on direct appeal for similar reasons. Again, the district court found on the record that he did not even notice the bracelets and could not read them from a distance, strongly implying that the jury could not have either. The jury could not have been biased by materials it did not see. *See Pulczinski*, 972 N.W.2d at 361. Thus, it would not have been objectively unreasonable for trial counsel to conclude that any motion for a *Schwartz* hearing would be denied. *See id.* Separately, it would not have been objectively unreasonable for *appellate* counsel to conclude that it was a reasonable trial strategy to simply move for a mistrial because of the bracelets immediately rather than wait for a jury to return a verdict and then request a post-trial evidentiary hearing on the matter. *See Schneider*, 725 N.W.2d at 521–22. Appellate counsel could also have reasonably concluded that an ineffective-assistance-of-trial-counsel claim would fail at the prejudice prong on these facts because we would review the district court's refusal to grant a *Schwartz* hearing for abuse of discretion. *See State v. Mings*, 289 N.W.2d 497, 498 (Minn. 1980); *State v. Tapper*, 993 N.W.2d 432, 437 (describing abuse of discretion as a "deferential standard of review").

Thus, Berry has not established that either trial counsel's or appellate counsel's failure bring these claims falls below *Strickland*'s objective standard of reasonableness. The factual allegations raised in the petition—which the State does not dispute—therefore entitle him to no relief.

*    *    *

For these reasons, we conclude that the district court did not abuse its discretion in denying Berry's postconviction petition without an evidentiary hearing. Berry has failed to allege facts that, if proven by a preponderance of the evidence, would establish that appellate counsel's failure to raise these claims constituted ineffective assistance under *Strickland*. Accordingly, Berry is not entitled to relief.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.